## H. P. FIGUERS v. W. M. FLY et al.*

### (Nashville.   December   Term,   1916.)

**1. ACKNOWLEDGMENT.   Liabiliy of notary.**

The taking by a notary public of an acknowledgment to a trust deed by one who is not the grantor, in which acknowledgment the notary recited that the person making it was a person with whom he was personally acquainted, is a ministerial, not a quasi judicial, act so far as to render the notary liable on his bond for his negligence, if any.   (*Post, p.* 363.)

**2. ACKNOWLEDGMENT.   Liability of officer.   Statute.**

Shannon's Code section 3769, making a clerk who takes the acknowledgment of a deed liable for injuries, caused by his failure to discharge the duties required of him, applies to notaries under Shannon's Code, section 3714, empowering notaries to take acknowledgments in the same manner and under the same rules and regulations as govern county court clerks under existing laws.   (*Post, pp.* 363, 364.)

Acts cited and construed:   Acts 1870, ch. 71

Code cited and construed:   Secs. 3714, 3722, 3769 (S.).

**3. ACKNOWLEDGMENT.   Liability of notary.   Identity of acknowledger.   Duty to ascertain.**

In the absence of statute, a notary is held to the care and diligence of a reasonably prudent man to ascertain the acknowledger's identity, but is not an insurer of the truth of the recitals, but, where a statute requires the identity of an acknowledger not personally known to the notary to be established by sworn witnesses, the notary acts at his peril in making the certificate on anything short of the evidence required by the statute.   (*Post, p.* 364.)

**4. ACKNOWLEDGMENT.   Liability of notary.   Certificate.   Reliance by third person,**

A certificate of an acknowledgment is an act which must be relied on with confidence by business men, and the notary must

---

*On the liability of notary or other officer certifying to acknowledgment or affidavit see extensive note in 49 L. R. A. (N. S.), 45.

The question of drawee's duty to know signature of drawer in payment of forged check or order is discussed in 27 L. R. A., 635.

On the right of drawee of forged check or draft to recover money paid thereon see note in L. R. A., 1915A, 77.

On the right of drawee of check to recover money paid on forged indorsement see note in L. R. A., 1916E, 539.

Figuers v. Fly.

exercise care to prevent imposition, since the effect of that imposition does not end with his own deception, but may extend to innocent persons relying on his exercise of due diligence. (*Post, pp.* 364, 365.)

5. ACKNOWLEDGMENT.   Liability   of   notary.   Certificate. "Personally acquainted with."

The phrase "personally acquainted with" in a certificate of acknowledgment means a knowledge independent and complete in itself and existing without information, and imports more than a slight or superficial knowledge. (*Post, pp.* 365, 366.)

Cases cited and approved: Kelly v. Calhoun, 95 U. S., 710; Fall v. Roper, 40 Tenn., 485; Willingham v. Potter, 131 Tenn., 18; State v. Ogden, 187 Mo. App., 39.

6. ACKNOWLEDGMENT. Liability of notary,. Negligence.

Where a notary took an acknowledgment of one who falsely pretended to be one of the grantors of a trust deed, and who had been previously induced by the other grantor at the time of making his acknowledgment to a forged chattel mortgage, and the notary knew the other grantor only slightly, and knew that the two had come to an inconvenient place to have the acknowledgments taken, though there was opportunity to have them taken nearer home, and he testified that the deed was signed in his presence, though it was apparent therefrom that the forged signature was placed thereon by the other grantor whom the notary claimed to know, the notary was negligent in taking the acknowledgment, and liable to one who loaned money on the security of the trust deed. (*Post, pp.* 366, 367,)

7. ACKNOWLEDGMENT. Liability of notary. Negligence. Proximate cause.

The negligence of a notary in taking the acknowledgment of one falsely claiming to be one of the grantors of a trust deed is nearer in time and causal relation to the loss sustained by one loaning money on the security thereof than the fraudulent representations made to the lender by the other grantor, and renders the notary liable for such loss. (*Post, pp.* 367, 368.)

Cases cited and approved: Grigsby v. Bratton, 128 Tenn., 597; People v. Nederlander, 177 Mich., 434.

8. **BANKS AND BANKING. Liability to depositor. Payment of check. Forged indorsement.**

If a drawee bank pays a check to which the payee's name is forged as indorser, the payment is deemed to be made out of its own funds, not the depositor's, provided the latter has not been guilty of negligence or fault that misled the bank. (*Post, p.* 368.)

Cases cited and approved: Pollard v. Wellford, 99 Tenn., 113; Farmers' etc., Bank v. Rutherford Bank, 115 Tenn., 64; Shuttle Co. v. Nat. Bank, 134 Tenn., 379.

9. **ELECTION OF REMEDIES. Payment of forged check. Liability of several persons.**

The maker of a check possession of which was fraudulently obtained by the payee's son, who forged the payee's indorsement thereon, cannot recover from the bank which paid the check, where he sought recovery in the same suit against the bank on which it was drawn, on the theory that in paying the check the drawee had paid out its own funds, not those of the maker of the check. (*Post, pp.* 368-370.)

Cases cited and approved: Farmer v. Bank, 100 Tenn., 190; Phillips v. Rooker, 134 Tenn., 457.

10. **BANKS AND BANKING. Payment of check. Liabilities between banks.**

A drawee bank which pays out money on a forged indorsement may recover it from the bank which received the proceeds, if the paying bank is to be loser in consequence of the forgery, especially where the receiving bank has guaranted the indorsement that turns out to be forged. (*Post, p.* 370.)

Cases cited and approved: People's Bank v. Franklin Bank, 88 Tenn., 299.

11. **BILLS AND NOTES. Indorsement of check. Liability between banks. Warranties.**

A stamped indorsement on a check, payable to a bank other than that on which it was drawn, guaranteeing indorsements, goes

Figuers v. Fly.

no further than a blank indorsement, and does not warrant to the drawee bank the genuineness of the signature of the maker of the check. (*Post, pp.* 370, 371.)

Cases cited and approved: Farmers' & Merchants' Bank v. Bank of Rutherford, 115 Tenn., 64; State Bank v. Cumberland, etc., Co., 168 N. C., 606.

12. **BILLS AND NOTES.** Liability of indorser. Signature of drawer. "Negotiation."

The warranty of signatures on a negotiable instrument imposed on an indorser by Negotiable Instruments Law (Laws 1899, chapter 94) section 66, does not run in favor of the drawee in respect of the genuineness of the signature of the drawer, but only in favor of subsequent holders in due course, and the drawee taking the instrument on presentation for payment is not such a holder, nor is such presentation a negotiation of the instrument (citing Words and Phrases, Second Series, Negotiation). (*Post, pp.* 371, 372.)

Acts cited and construed: Acts 1899, ch. 94.

13. **BANKS AND BANKING.** Liability. Forged check. Payment.

The doctrine that a drawee bank which paid a forged check can not recover the amount thereof under Negotiable Instruments Act, section 62, which provides that the acceptor of a negotiable instrument admits the existence of a drawer, the genuineness of his signature, and his capacity and authority to draw the instrument, applies only in favor of one who was a bona fide holder for value of the forged check. (*Post, pp.* 372, 373.)

Cases cited and approved: Title Guaranty & T. Co. v. Haven, 196 N. Y., 487; Cherokee Nat. Bank v. Union Trust Co., 33 Okl., 342; First Nat. Bank v. Bank, 59 Or., 388; Price v. Neal, 3 Burr., 1354; Bank of U. S. v. Bank of Georgia, 10 Wheat., 333; National Park Bank v. Ninth National Bank, 46 N. Y., 77; Peoples Bank v. Franklin Bank, 88 Tenn., 299.

14. **BANKS AND BANKING.** Liability. Forged check. "Holder for value."

Under Negotiable Instruments Act, section 25, providing that an antecedent or pre-existing debt constitutes value, a bank to

whom a forged check was given in payment of a pre-existing debt is a holder for value, though it was the payee, and not an indorsee, on purchase or discount, especially where it surrendered in return for the check a note signed by personal solvent sureties. (*Post, pp.* 373, 374.)

Cases cited and approved: Liberty Trust Co. v. Tilton, 217 Mass., 462; Armstrong v. American Exchange Nat. Bank, 133 U. S., 433.

15. **BANKS AND BANKING. Payment of check. Liability to maker. Forged indorsement.**

The doctrine that the drawer of a check made payable to an imposter cannot recover of a drawer or intermediate bank because the payment on indorsement of the imposter carries out the actual intention of the drawer, though such intention was induced by fraud, does not apply where the imposter does not assume the name by which the payee was described in the check, but pretends merely that he is the agent of the described payee in receiving and indorsing check. (*Post, pp.* 374, 375.)

Cases cited and approved: Murphy v. Metropolitan Nat. Bank, 191 Mass., 159; Armstrong v. Nat. Bank, 46 Ohio St., 512; Land Title & Trust Co. v. N. W. Nat. Bank, 50 L. R. A., 80; Russell v. First Nat. Bank, 2 Ala. App., 342.

Case cited and distinguished: Goodfellow v. First Nat. Bank, 71 Wash., 554.

16. **BANKS AND BANKING. Payment of check. Liability to maker. Duty of bank.**

The hazard of ascertaining the authority of the person who asserts the right to indorse a check or to receive or check out funds as its product is imposed on the drawee bank, unless it has been misled by the negligence of the drawer, or the latter has estopped himself. (*Post, pp.* 375, 376.)

Case cited and approved: Central Nat. Bank v. Nat. Metropolitan Bank, 31 App. D. C. 391.

17. **BANKS AND BANKING. Payment of check. Liability to maker.**

Where one who had loaned $1,000 on the security of a trust deed made his check payable to the owner of the land and delivered

Figuers v. Fly.

it to the owner's son, anl thereafter wrote out a check for the broker's commission on the loan, which the son signed in his father's name, but in an illegible hand, and the lender wrote the father's name legibly underneath the signature, after which the son, accompanied by the broker, took both checks to a bank of which the broker's brother-in-law was cashier, and deposited the $1,000 check, stating that he desired to check against the deposit, and his authority to do so was confirmed by the broker, the lender did not vouch for the son's authority to sign checks on the deposit, and was not negligent in seeking to interpret the signature so as to justify the bank cashier in making no further inquiry as to the son's authority to check against the deposit, and the lender is therefore not precluded from recovering from the bank the amount of that check. (*Post, pp.* 376-378.)

18. **BANKS AND BANKING.** Payment of check. Negligence of maker. Reliance by bank.

Those facts show that the cashier did not rely on the interpretation of the signature by the lender, but upon the assurance of his kinsman as to the authority of the son to check against the deposit. (*Post, p.* 378.)

19. **BANKS AND BANKING.** Payment of check. Forged indorsement. Laches. Duty of depositor.

A depositor is not guilty of laches for failure to discover the forged indorsement of the payee of a check which was deposited in another bank, where he had no reason to suspect that the fund had been checked out by an unauthorized person, since he had no duty to scan his checks returned by the bank to discover any such diversion. (*Post, pp.* 379, 380.)

Cases cited and approved:   Morgan v. U. S. Mortgage & T. Co., L. R. A., 1915D, 748.

---

## FROM MAURY.

---

Appeal from the Chancery Court of Maury County. —W. S. BEARDEN, Chancellor.

H. P. FIGUERS and HOLDING & GARNES, for appellant.

J. H. DINNING, W. S. FLEMING, HUGHES & HUGHES and E. H. & C. P. HATCHER, for appellee.

MR JUSTICE WILLIAMS delivered the opinion of the Court.

The bill of complaint was filed to hold liable the several defendants for the amount of a check, $1,000, drawn in favor of W. D. Bryant and delivered by complainant Figuers in a loan by him of funds purportedly made to one W. D. Bryant and secured by a deed of trust on the lands of the latter.

W. D. Bryant is an ex-Confederate soldier, aged seventy-six years, who resides in Maury county, about eighteen miles from Columbia, the county seat. He owns a farm of about sixty-four acres, of value from $2,500 to $3,000. Two sons, J. G. Bryant and E. M. Bryant, both young men of legal age, were members of his family, and the sons and the father stood high in the regard of their community.

J. G. Bryant became involved in sawmilling transactions, and fell into devious practices. There is more than an intimation in the record that another person who was in his employ at the time, one Morris, since deceased, was used as an aid in his schemes which involved frauds and forgeries, which schemes proved easier of consummation because of the family's reputation for probity and because of J. G. Bryant's own apparent unsophistication. With-

Figuers v. Fly.

out being a practiced deceiver he, in the transaction
here involved, wove a web so tangled as that a
four-cornered litigation has resulted, involving a
lawyer, a notary public, and two banks, as parties
to this contest.

Hardin P. Figuers, of Columbia, is one of the
leading lawyers of the Middle Tennessee bar, and
the author of Figuers' Chancery Manual. As a part
of his practice he loans, to an unusual extent, the
moneys of clients. Knowing this fact, J. G. Bryant
approached Figuers, avowedly in behalf of his father,
for a loan of $1,000 on the farm as security. He
was introduced by Embry, a real estate agent of
Columbia, and made application for the loan. Fig-
uers asked for time within which to investigate the
proposed lender and the title of the land, improve-
ments, etc. His investigation along all lines proving
satisfactory, he informed Embry that he could lend
the money, and the latter informed J. G. Bryant, who
returned to the city to close the deal.

Figuers took notes for use in the drafting of the
deed of trust, and asked J. G. Bryant for the name
of his mother. The reply, falsely given, was that she
was dead. Bryant then informed Figuers that he
had an interest in the land by purchase from his
father, but that no deed had been executed to him
for it, and that perhaps he (J. G. Bryant) ought
to join in the execution of the deed of trust, and it
was so drawn. However, the loan, as first proposed
and as finally closed, was made to W. D. Bryant as
record owner of and on the security of the farm.

J. G. Bryant, referring to the facts that his father was an aged man and lived so far in the country, asked whether the matter of signing and acknowledging could not be attended to without his father coming to town, and Figuers replied that it could if the two Bryants would go before a notary public in their neighborhood. J. G. Bryant left, taking the draft of the deed of trust and a note for $1,000 filled out by Figuers for their signatures. He returned in a few days bringing both instruments, apparently signed by the father and son, the trust deed having attached to it the certificate of defendant Fly, as notary public, which recited according to the prescribed statutory formula, that W. D. Bryant and J. G. Bryant, "the within named bargainors, with whom I am personally acquainted," had personally appeared before Fly and acknowledged its execution. In point of fact W. D. Bryant had not signed or acknowledged either of the documents.

When these were delivered to Figuers and he had seen to the registration of the trust deed, he delivered to J. G. Bryant his check on the Maury National Bank, of Columbia, for $1,000. A short time thereafter Embry called Figuers on the telephone and was out of humor because his commission of $14 had not been retained by Figuers out of the loan sum. Later, Embry and Bryant went to the office of Figuers, and the latter at Bryant's request filled out a check of $14 for Bryant to sign, drawing it on the Phœnix National Bank in favor of Embry as payee. Figuers

understood that Bryant had at that time deposited the $1,000 check in that bank to his father's account, influenced to do so by Embry, who was the step-brother of its cashier, Fulton.

Such a deposit of that check to the account of the father either had been made or was about to be made by J. G. Bryant, who assumed the authority to in-dorse the name of W. D. Bryant. In fact W. D. Bryant had no knowledge of or participation in any of these transactions. J. G. Bryant merely used his name and credit as means of imposing on the notary, the attorney, and the bank.

The Phœnix Bank accepted such indorsement in the name of W. D. Bryant, the cashier having "very slight acquaintance" with the son, but knowing him to be one of the Bryant boys. J. G. Bryant after signing his father's name as indorser, affixed his own, "J. G. Bryant."

The Phœnix Bank indorsed the check, setting forth "indorsements guaranteed," and collected the fund from the Maury Bank thereon.

J. G. Bryant for years saw to it that the interest on the $1,000 note was paid annually, but finally allowed default and departed the state. When the truth as to his forgery developed, Figuers filed the bill of complaint against the notary for negligence in the taking of the acknowledgment, and also against the two banks.

The Maury Bank filed a cross-bill, seeking to hold liable the Phœnix Bank on the latter's guaranty of

the indorsement, in event the former bank should be held liable on account of honoring and paying its depositor's check on an unauthorized and forged indorsement of the payee's name.

Other facts will be recited in the body of the opinion in the discussion of the questions of liability and defense.

I. As to the liability of the defendant notary public to complainant because of the false certificate:

A lengthy discussion by counsel is entered into in regard to the nature of an act performed by a notary public in taking a single person's acknowledgment—whether ministerial or *quasi* judicial. That may be here treated as a thing quite aside, as we think that the taking of the acknowledgment in this case was clearly so far ministerial as that the notary may be held to respond under his bond for negligence, if any there be.

By the provisions of Code (Shannon), section 3769, if a clerk who takes the acknowledgment of a deed fails to discharge the duties required of him, he shall be liable to the party injured for all damages he may sustain; and a notary public is likewise liable since by Act 1870, chapter 71, they are empowered to take acknowledgments ''in the same manner and under the same rules and regulations as govern county court clerks'' under existing laws. Code (Shannon), section 3714.

Counsel for complainant have undertaken to assimilate completely the notary to such clerk and to

demonstrate that a notary public in taking the acknowledgment of one with whom he is not personally acquainted may be held for a loss due to a failure on his part to identify the acknowledger if he does not require the production of witnesses before him "to prove the identity of the person so offering to acknowledge the same"; referring to Code (Shannon), section 3722. The argument is that liability accrues because the notary did not comply with what is claimed to be the statutory standard of due care in such case—the requirement of sworn proof ·as to the identity of an acknowledger not known to him.

The common law and the statutory. measures of diligence to be observed by a notary are thus correctly stated and contrasted in 1 Corp. Juris, 903:

"Where there is no statute prescribing the manner in which the officer shall ascertain the acknowledger's identity, he is held to .the care and diligence of a reasonably prudent man; but he is not an insurer of the truth of his recitals. Where, however, it is prescribed by statute that if the officer does not personally know the acknowledger to be the person decribed in the instrument, his identity must be. established by sworn witnesses, the officer acts at his peril in making the certificate on the strength of a mere introduction or anything short of the evidence required by the statute."

We need not decide whether a notary is within .the purview of the Code section (3722) thus relied on, and therefore governed by a statutory standard more

137 Tenn.—24

stringent than the one of the common law. We are of opinion that if the latter governs, the defendant notary is liable.

The functions of a notary public are not to be lightly assumed; the amount of the bond required of him ($5,000) should indicate as much to one who proposes to perform the duties of the office. A certificate of acknowledgment is an act which must in the nature of things be relied on with confidence by men of business. Those buying or taking security by way of liens on real estate ought not to be required to look with suspicion on such a certificate or compelled to make proof of its recital as to the notary's personal acquaintance with the acknowledger.

"Personally acquainted with" in such a certificate means a knowledge independent and complete in itself, and existing without other information. *Kelly* v. *Calhoun*, 95 U. S., 710, 713, 24 L. Ed., 544.

The phrase imports more than a slight or superficial knowledge. 1 Corp. Juris., 904, and cases cited.

"It is one of the most important requirements—as a protection against fraud—contained in the formula prescribed by the statute." *Fall* v. *Roper*, 3 Head. (40 Tenn.), 485. And see *Willingham* v. *Potter*, 131 Tenn., 18, 173 S. W., 434.

The law warns a notary, when he has not personal acquaintance with the bargainor, that he must exercise care to prevent imposition, since the effect of that imposition does not end with his own deception,

but may extend to innocent persons relying upon
his exercise of due diligence. The certificate becomes
"authentic evidence of titles by which we hold our
lands and by which they pass from one to another
and which endure from generation to generation.".
*State* v. *Ogden,* 187 Mo. App., 39, 172 S. W., 1172.

The notary does not claim that he made any inquiry
as to the identity of the one who pretended to be
W. D. Bryant at the time of the taking of the acknowl-
edgment involved in this suit. That acknowledgment
was taken and certified on September 17, 1909. His
claim is that on April 9, 1909, he had been called upon
to take the acknowledgment of W. D. Bryant, J. G.
Bryant, and E. M. Bryant to a distinct instrument—a
mortgage on personalty purporting to be signed by
the three Bryants to secure a loan obtained from
Judge W. B. Turner. That mortgage it developed
was also forged so far as old man Bryant was con-
cerned. But the notary's insistence is that a stranger
(perhaps Morris) was introduced to him as J. G.
Bryant's cousin, W. D. Bryant, who was desirous of
joining in the execution of the Turner mortgage;
and, as he knew the two Bryant boys by sight and
justifiably deemed them to be of good standing, it
was not negligence on his part to take the acknowl-
edgment of the stranger. Further, that on the faith-
of that introduction it was not required of him that
he make further inquiry when later the Figuers
trust deed was presented by J. G. Bryant and the
stranger.

The weakness of the position of the notary public
is found in these facts: The Bryants did not live
in his neighborhood, and he was not well acquainted
with any one of the three.  His and their respective
homes were seven or eight miles apart, and separated
by a ridge which prevented free social and business
intercourse.  If the fact that the first mortgage was
brought to him by J. G. Bryant for acknowledgment,
instead of being taken to the notary in his (Bryant's)
own neighborhood, did not serve to put him on guard,
the second or repeated visit should have done so.
Why was it taken to an inconvenient place for ac-
knowledgment, when all the ostensible makers were
young men able to take it to Columbia where it was
to be delivered following acknowledgment?  Further,
the notary testifies that the signatures "W. D. Bry-
ant" and "J. G. Bryant" were affixed to the trust
deed in his presence.  It is apparent that J. G.
Bryant wrote the name "W. D. Bryant" as a maker,
though the notary relies on the earlier introduction
by J. G. Bryant of the stranger as warranting him
in taking the latter's acknowledgment as W. D.
Bryant's.  We hold that the notary in the circumstan-
ces did not exercise due care.

It is next urged in behalf of the defendant notary
that his negligence in relation to the acknowledg-
ment and certificate was not the proximate cause of
the loss.  But for the certificate and its recitals,
however, the funds would not have been parted with
by Figuers, who relied on same as the law justified

him in doing.   The notary's act was nearer in time
and in causal relation, actual and legal, than were
the fraudulent representations of J. G. Bryant to
Figuers, and is, therefore, to be deemed the efficient
and proximate cause, rather than one of two co-
efficient causes, since the loss followed in a sequence
that was natural (therefore to have been contem-
plated), unbroken, and uncontributed to by any
other independent, self-supporting, negligent act of
the complainant. *Grigsby* v. *Bratton,* 128 Tenn., 597,
163 S. W., 804; note to *People* v. *Nederlander,* 177
Mich., 434, 143 N. W., 753, Ann. Cas., 1915C, 1029.

II.  As to the rights of complainant against the
Maury Bank:

The governing principles are well settled.   If a
drawee bank pays a check to which the payee's name
is forged, as indorser, the payment is deemed to be
one made out of its own funds, and not the deposit-
or's provided the drawer has not been guilty of some
negligence or fault that misled the bank. *Pollard* v.
*Wellford,* 99 Tenn., 113, 42 S. W., 23; *Farmers', etc.,
Bank* v. *Rutherford Bank,* 115 Tenn., 64, 88 S. W.,
939, 112 Am. St. Rep., 817; *Shuttle Co.* v. *Nat. Bank,*
134 Tenn., 379, 183 S. W., 1006, and cases cited.   7
Corp. Juris, 686.

III.  As to the right of complainant to recover of
the Phœnix Bank:

The claim of right to recover directly of the Phœnix
Bank is by complainant based on the case of *Farmer*

v. *Bank*, 100 Tenn., 190, 47 S. W., 234, in which it is said that one coming into possession of such paper, with a forged indorsement of the payee's name, cannot successfully resist the title of the true owner, or, if it has been converted into money, a demand for its proceeds, because of the intermeddling with property not one's own.

In 1 Morse on Banks and Banking, section 248, it is said:

"If a negotiable instrument, having a forged indorsement, comes into the hands of a bank and is collected by it, the proceeds are held for the rightful owner of the paper, and may be recovered by him, although the bank gave value for the paper, or has paid over the proceeds to the party depositing the instrument for collection."

Ordinarily such true owner is the payee, but in the circumstances of the instant case it might be, at his election, complainant Figuers who drew it and parted with it by reason of vitiating fraud; and had complainant's suit been against the Phœnix Bank alone, based on this theory and the particular facts of this case, he would have been entitled to recover, it seems.

A difficulty arises, however, in this: Complainant has sued the Maury Bank in the same bill of complaint, and takes a recovery against that bank on the theory, necessarily, that that bank did not pay out the fund as his, but on the contrary parted with its own money. Holding to this relief, he asks to be treated as the true owner of the fund that passed

from the Maury Bank to the Phœnix Bank. His fund cannot be in both banks. The court cannot put the seal of approval on this inconsistency by passing two judgments in favor of the same party in the same cause based on such diverse and antagonistic theories. *Phillips* v. *Rooker*, 134 Tenn., 457, 184 S. W., 12.

Fortunately, there is no necessity therefor, since there is no sort of doubt on this record as to the abundant solvency of the Maury Bank, which is held to respond to complainant, and which in turn must be given its own remedy against the Phœnix Bank.

IV. As to the rights of the Maury Bank against the Phœnix Bank:

A drawee bank which pays out money on a forged indorsement may recover it from the bank which received the proceeds, if the paying bank is to be loser otherwise, in consequence of the forgery. *People's Bank* v. *Franklin Bank*, 88 Tenn., 299, 12 S. W., 716, 6 L. R. A., 724, 17 Am. St. Rep., 884. And more manifestly so where, as here, the receiving bank has guaranteed the indorsement that turns out to be forged. 7 Corp. Juris., 692. The chancellor's decree in favor of the Maury Bank under its cross-bill was correct.

V. As to the right of set-off claimed by the Phœnix Bank against the Maury Bank:

The Phœnix Bank claims that it should not account to the Maury Bank for the full amount of the $1,000 check because the latter bank received out of the

$1,000 deposited in the former bank a certain sum which went to pay a note held by the Maury Bank, signed by J. G. Bryant, who had also forged his father's name as a comaker.

It appears that among the checks paid by the Phœnix Bank out of the $1,000 deposit was one drawn as follows:

"Phœnix National Bank: Pay to the order of the Maury National Bank $325.00, three hundred and twenty-five dollars, for borrowed money.

"[Signed]                    W. D. Bryant."

This check was indorsed by stamp as follows:

"Clearings for Sept. 22, 1909, indorsements guaranteed, Maury National Bank."

On this indorsement and presentation $325 passed out of said deposit into the Maury Bank. This check was not signed by W. D. Bryant, or even by J. G. Bryant, but probably by Morris.

An indorsement in blank does not have the effect to warrant or guarantee the genuineness of the signature of the maker of the check to the drawee bank—the Phœnix Bank. *Farmers' & Merchants' Bank* v. *Bank of Rutherford,* 115 Tenn., 64, 71, 88 S. W., 939, 112 Am. St. Rep., 817. And the express contractual guaranty stamped on the check went no further. *State Bank* v. *Cumberland, etc., Co.,* 168 N. C., 606, 85 S. E., 5, L. R. A., 1915D, 1138.

The law-imposed warranty, embodied in the Negotiable Instruments Law, section 66, does not run in favor of the drawee in respect of the genuineness of

the signature of the drawer, but only in favor of subsequent holders in due course, and the drawee taking over the instrument on presentation for payment is not such a holder. Such presentation is not a "negotiation" of the check within the meaning of the act.  3 Words and Phrases (Second Series), 586.

What was indicated in *Farmers' & Merchants' Bank* v. *Bank of Rutherford,* supra, as the true measure of the duty and liability of the drawee bank which pays a check upon the forged signature of its customer, appears now to be the rule in several jurisdictions, under the construction given to the Negotiable Instruments Act, section 62, which provides that the acceptor of a negotiable instrument admits "the existence of a drawer, the genuineness of his signature, and his capacity and authority to draw the instrument." *Title Guarantee & T. Co.,* v. *Haven,* 169 N. Y., 487, 89 N. E., 1082, 1085, 25 L. R. A., (N. S.), 1308, 17 Ann. Cas., 1131; *Cherokee Nat. Bank* v. *Union Trust Co.,* 33 Okl., 342, 125 Pac., 464; *First Nat. Bank* v. *Bank,* 59 Or., 388, 117 Pac., 293; Crawford Ann. Neg. Inst. Law, 120, and cases cited. This enactment is said to be merely declaratory of the common law, as announced by Lord MANSFIELD in the leading case of *Price* v. *Neal,* 3 Burr., 1354, by the supreme court of the United States in *Bank of U. S.* v. *Bank of Georgia,* 10 Wheat., 333, 6 L. Ed., 334, and by the court of appeals of New York in *National Park Bank* v. *Ninth National Bank,* 46 N. Y., 77, 7 Am. St. Rep., 310, which held that it is in-

cumbent upon the drawee bank to satisfy itself of the genuineness of the drawer's signature before accepting or paying the bill or check, and that if a mistake is made it is the drawee's neglect or misfortune. What was said on this subject in *People's Bank* v. *Franklin Bank,* 88 Tenn., 299, at page 303, 12 S. W., 716, L. R. A., 724, 17 Am. St. Rep., 884 (which was criticized in *F. & M. Bank* v. *Rutherford Bank,* supra, as being opposed to the weight of authority), must now be read in the light of the later Negotiable Instruments Act, section 62, if, indeed, it were ever sound. A limitation upon the doctrine, under the Negotiable Instruments Law, is that the protection applies only in favor of one who is a holder for value of a check which turns out to have been forged as to the name of the maker.

But the Maury Bank did not fail to attain the *status* of a holder for value because it was the payee named in the check, and not an indorsee on purchase or discount. *Farmers' & Merchants' Bank* v. *Bank of Rutherford,* supra; *Liberty Trust Company* v. *Tilton,* 217 Mass., 462, 105 N. E., 605, L. R. A., 1915B, 144; *Armstrong* v. *American Exchange National Bank,* 133 U. S., 433, 10 Sup. Ct., 450, 33 L. Ed., 747; Crawford Ann. Neg. Inst. Law, 96.

The fact that the Maury Bank accepted the check in payment of a pre-existing debt did not have the effect to deny to that bank the *status* of a holder for value, since by section 25 of the act an antecedent or pre-existing debt constitutes value.

Furthermore, the Maury Bank upon receiving the check canceled and surrendered for it the note it held against J. G. Bryant which was signed by solvent personal sureties, and would be prejudiced if it were compelled to respond to the drawee bank. 7 Corpus Juris, p. 688, section 417.

We hold that the Phœnix Bank is not entitled to credit on the liability sum for the check of $325, or for any other check of like nature.

VI. As to the defenses to complainant's demand urged by the two banks:

(a) An argument on analogy is predicated by the solicitors of the two banks upon the rulings in many cases to the effect that the drawer of a check made payable to an imposter cannot recover of a drawee, or intermediate, bank, on the ground that such bank, in paying the check on the indorsement of the imposter under the assumed name, but carries out the actual intention with which the drawer issued the check, although that intention was induced by the fraud of the imposter in representing that he was another person, whose name he assumed.

But the authorities appear to be harmonious in holding that this doctrine of payment according to the actual intent of the drawer of a check is not applicable where the impostor does not assume the name by which the payee is described in the check, but pretends merely that he is agent of such described payee in receiving and indorsing the check. In such case the holdings of the courts have been that as

between the drawee and the bank, the loss falls on the latter, nothing else appearing. *Murphy* v. *Metropolitan Nat. Bank,* 191 Mass., 159, 77 N. E., 693, 144 Am. St. Rep., .595; *Armstrong* v. *National Bank,* 46 Ohio St., 512, 22 N. E., 866, 6 L. R. A., 625, 15 Am. St. Rep., 655; and cases cited in note *Land Title & Trust Co.* v. *N. W. Nat. Bank,* 50 L. R. A., 80; *Russell* v. *First Nat. Bank,* 2 Ala. App., 342, 56 South., 868.

This distinction is taken by those courts which apply the doctrine of actual intention where the imposter assumes to be the very person described as payee, when it comes to dealing with a case where the imposter merely assumes to be the agent of the one named as payee of the check.

In *Goodfellow* v. *First Nat. Bank,* 71 Wash., 554, 129 Pac., 90, 44 L. R. A. (N. S.), 580, the two rules were contrasted:

"But this principle is not applicable in the instant case. Here the check was made payable to the order of an existing person in whose name the title to the property covered by the mortgage stood, and it was delivered to Peeples as the agent of Mrs. Barnes. In such a case the drawer does not vouch for the right of the agent, or any other unauthorized person to indorse the name of the payee upon the check."

The hazard of ascertaining for itself the fact of the existence of authority in the person who asserts the power to indorse such a check or to receive or check out the funds, as its product, is imposed upon

the drawee bank; and it is only where the bank has been misled by some negligent act of the drawer of the check, or the latter has estopped himself *in pais,* that the bank which has acted on faith in the imposter's authority can throw the burden of the loss upon the drawer.

The Maury Bank, as drawee, does not claim that it was caused to honor the check so indorsed by any negligent act of Mr. Figuers that immediately operated on it.

However, the Phœnix Bank does put forward such a claim on its part, and the Maury Bank joins it in urging the validity of the defense as one that shields both banks from liability. This effort to dovetail the defenses of the banks is based upon language used in *Central Nat. Bank* v. *Nat. Metropolitan Bank,* 31 App. D. C., 391, 17 L. R. A. (N. S.), 520. Without passing on the soundness of that phase of the decision so relied on, we go to an examination of the asserted negligence of the drawer of the check.

The claim is that on the same day that Figuers issued the check representing the loan sum, he wrote out for Bryant at his request a small check for $14, above referred to, on the Phœnix Bank, in which bank the principal check had been or was to be deposited by Bryant. This check for $14 was drawn in favor of Embry, the real estate agent who had commissions in that amount for services in procuring the loan. When Figuers had written out the body of this small check, J. G. Bryant signed it "W. D. Bryant." This

signature was such a scrawl that it was well-nigh illegible. Noting this fact, Figuers wrote in his own plainer handwriting below it "W. D. Bryant" merely for the purpose of interpreting the scrawl.

It is insisted by the banks that the proof establishes the fact that when J. G. Bryant went to the Phœnix Bank he was accompanied by Embry, and that both of these checks were presented to the cashier of the bank at the same time. The record shows this last question of fact to be a close one. Without deciding it, let it be assumed, for test purposes, that the cashier is correct in his rendition of the circumstances, and that when he accepted the deposit of the principal check under the indorsement of W. D. Bryant's name by J. G. Bryant, he saw that Figuers had written the interpreting words "W. D. Bryant" below the signature on the $14 check. Did this fact fairly tend to mislead the bank's officer, as an act of negligence on Figuers' part?

Fulton, the cashier, testified as follows on this phase of the case:

The $1,000 check was handed the cashier by J. G. Bryant, with instructions to place the same to the credit of W. D. Bryant. Fulton asked J. G. Bryant whether "he expected to check against his father's account" and he said that he did. He was then informed by Fulton that he could not do this without written evidence from W. D. Bryant, it being explained that a man could open an account for another man by placing his money to his credit, but the fact

of his placing it there did not license him to check on the account. At this point, Embry was standing by and said to Fulton, who was his step-brother, "That is the way the fund is expected to be checked," and then presented the check for $14, above described. Fulton, himself, says that Figuers had "identified the signature."

We fail to see in this, if true, any vouching by Figuers as to the existence of authority on the part of the imposter, J. G. Bryant, to indorse the principal check or to draw out the funds by signing his father's name to checks on the Phœnix Bank. We also think there was no negligence in Figuers undertaking to interpret the name "W. D. Bryant" that could justify Fulton in not making inquiry to govern his dealing with the much larger fund of $1,000. Further, Fulton did not do so. He accepted the assurance of his kinsman standing by, which assurance went directly to the mode of checking out the fund. That matter of checking out the fund, and not any risk involved in the matter of taking J. G. Bryant's indorsement of W. D. Bryant's name of the $1,000 check, was what gave the cashier concern, and he was quieted as to that matter by the remark of Embry, whose interest in collecting the $14 check must have been apparent. We cannot see that either of the banks was led by any act of Figuers to rely upon the imposter as one having authority to deal with the principal check or the fund. *Goodfellow* v. *First Nat. Bank,* supra.

(b) The two banks resist recoveries on the further ground that the complainant waited so long in discovering the forgery that negligence on his part is shown; and he, it is urged, is barred of any remedy because of laches. We are dealing here not with a forgery of complainant's own signature, but with a failure to discover the forged indorsement of the intended payee of the check, where there was no reason for Figuers suspecting that the fund had been checked out by an unauthorized person.

In such case, where there is no sufficient reason to suspect indorsement by means of a forged signature or payment to a wrong person, duty does not require the drawer to scan his charged-up checks, returned by the bank, for the purpose of discovering any diversion. *Murphy* v. *Metropolitan Nat. Bank,* supra, and notes to *Morgan* v. *U. S. Mortgage & T. Co.,* L. R. A., 1915D, 748, and Ann. Cas., 1914D, 465. Complainant had a right to rely upon the bank's exercise of care in respect to ascertaining the authority of J. G. Bryant to indorse the name of W. D. Bryant.

By no pleading are we called upon to decree as to the order of liability of the several defendants, and we do not do so further than is necessarily indicated by the ruling in favor of the Maury Bank against the Phœnix Bank.

The decree of the chancellor will be modified so as to deny a recovery in favor of complainant against the Phœnix Bank, and so as to make the judgments against the notary public and the Maury Bank

Figuers v. Fly.

several instead of a joint one. The costs of the court below and of the appeal will be paid, one-seventh by complainant, one-seventh by the Maury Bank, two-sevenths by the Phœnix Bank, and three-sevenths by defendant Fly.