BANK OF COMMERCE & SAVINGS, APPELLEE, v. CHARLES C. RANDELL, APPELLANT.

FILED DECEMBER 21, 1921. No. 21724.

1. **Notes:** "HOLDER IN DUE COURSE." A payee who receives a negotiable instrument in good faith, for value, before maturity, and without notice of any infirmity therein, from a holder, not a maker or drawer, to whom it was negotiated as a completed instrument, is a holder in due course within the purview of the negotiable instruments law (Rev. St. 1913, secs. 5319-5513) so as to preclude the defense of fraud and failure of consideration between the maker or drawer and the holder to whom the instrument was delivered.

2. ———: FRAUD AND GOOD FAITH: QUESTIONS FOR JURY. Evidence

examined, and *held* that different minds might draw different conclusions therefrom as to whether or not there was fraud in the inception of the note, and, if so, whether or not appellee had knowledge thereof at the time it purchased the note; and, therefore, the case should have been submitted to the jury under proper instructions.

APPEAL from the district court for Douglas county: CHARLES LESLIE, JUDGE. *Reversed.*

*Crofoot, Fraser, Connolly & Stryker*, for appellant.

*Montgomery, Hall & Young, contra.*

Heard before MORRISSEY, C. J., ALDRICH, FLANSBURG and ROSE, JJ., BUTTON and COLBY, District Judges.

BUTTON, District Judge.

In November, 1918, W. A. McClaran and C. A. Lanagan sold the note of one Randell for $10,000 to the Bank of Commerce & Savings, of Duluth, Minnesota. The original note obtained from Randell by McClaran and Lanagan was in payment of certain shares of stock in the Onahman Iron Company. Randell claimed this note was obtained by fraud and without consideration, and also claimed the bank had notice of these facts at the time it purchased the note. The sale was made to one Locher, acting president of the bank, and Locher claimed he had no knowledge of any infirmity in the note at the time of purchase. Locher furnished McClaran and Lanagan a blank note of the bank, and the note was made direct to the bank as payee, and, at the request of Locher, the shares of stock in the Onahman Iron Company were deposited with the bank as collateral.

The bank claimed to be a holder of the note in due course, and that the defense of fraud was not available to the defendant as against it. We are confronted with three questions: Can the payee named in a negotiable promissory note, under the negotiable instruments law, ever be a holder in due course? If so, was the original note, obtained by McClaran and Lanagan from Randell,

fraudulent and without consideration? And, if so, did the bank have notice of said facts?

Taking up the first question, we believe it is necessary to consider certain sections of the negotiable instruments law in order to answer it intelligently. We shall refer to the sections considered as contained in the Revised Statutes of Nebraska for the year 1913.

Section 5370. "A holder in due course is a holder who has taken the instrument under the following conditions: First, that it is complete and regular upon its face; second, that he became the holder of it before it was over-due and without notice that it had been previously dis-honored, if such was the fact; third, that he took it in good faith and for value; fourth, that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person nego-tiating it."

Section 5348. "An instrument is negotiated when it is transferred from one person to another in such manner as to constitute the transferee the holder thereof. If payable to bearer it is negotiated by delivery. If pay-able to order it is negotiated by the indorsement of the holder completed by delivery."

In subdivision 4, sec. 5370, the word "negotiated" is used. Under this section the instrument must be nego-tiated if the one who receives it is to be a holder in due course. We must, therefore, ascertain the meaning of the word "negotiate" as used in the statute, and also whether it is any different than in the law merchant. The first sentence of section 5348 appears to be a complete definition of "negotiate" and harmonizes with its meaning in the law merchant. In the case of *Liberty Trust Co. v. Tilton,* 217 Mass. 462, L. R. A. 1915B, 144, it is held that the provision of the negotiable instruments law that an instrument is negotiated by delivery if payable to bearer, while if payable to order it is negotiated by the indorse-ment of the holder completed by delivery, was not in-tended to include all the ways in which an instrument

might be negotiated. The second sentence of the section simply recites the two usual and ordinary ways of negotiating an instrument. In the case at bar McClaran and Lanagan signed their names on the back of the note with their guaranty at the time they delivered it to the bank. By reference to sections 5377 and 5507 it appears that the above definition is in harmony with the legislative intent. Section 5507 says: " 'Holder' means the payee or indorsee of a bill or note, who is in possession of it, or the bearer thereof." Section 5377 says: "Every holder is deemed *prima facie* to be a holder in due course." Even a payee who gets the note direct from the maker is a *prima facie* holder in due course. Of course, this presumption is rebutted by proof of the fact. But, if every holder is deemed a *prima facie* holder in due course, then a payee who got the note from a holder, other than the maker or drawer, is also a *prima facie* holder in due course. Substituting in section 5370 the equivalent of holder, the section would read: "A holder in due course is a payee or indorsee of a bill or note, who is in possession of it, or the bearer thereof, who has taken the instrument under the following conditions," etc. The statute, then, recognizes that a payee may be a holder in due course. This meaning is so obvious that the legislature must have intended it, or it would have said otherwise in plain language. Any other construction of the statute takes away a common-law right, and such a construction should not be adopted unless the plain words of the act compel it. The word "negotiate" is properly defined in the first sentence of section 5348, and is in perfect harmony with the other sections, which, to say the least, recognize that a payee may be a holder in due course. And this definition is not materially different from the common-law definition.

We conclude, therefore, that a payee who receives a negotiable promissory note, in good faith, for value, before maturity, and without notice of any infirmity, from a holder, not the maker, to whom it was negotiated as a

completed instrument, is a holder in due course within the purview of 'the negotiable instruments law, so as to preclude the defense of fraud and failure of consideration between the maker and the holder to whom the instrument was delivered.

This conclusion is supported by a long line of authorities also holding the negotiable instruments law has not changed the law merchant in this respect.

"A promissory note, complete as to form, and payable to a named person, may be negotiated to that person by being sold to him or taken by him for value. This is the common and popular signification of the word. It was the sense in which it was used in the law merchant before the negotiable instruments act. Its meaning has not been changed by the act. * * * The word 'negotiate' being defined thus in the act, and being given a definition in conformity to that attached to it by the common law before the passage of the act, it must be held to have the same meaning throughout the statute, in the absence of a strongly countervailing context requiring a different signification." *Liberty Trust Co. v. Tilton,* 217 Mass. 462, L. R. A. 1915B, 144. See, also, *Merchants Nat. Bank v. Smith,* 59 Mont. 280; *Redfield v. Wells,* 31 Idaho, 415; *Johnston v. Knipe,* 260 Pa. St. 504; *Brown v. Rowan,* 154 N. Y. Supp. 1098; *Figuers v. Fly,* 137 Tenn. 358; *Dixon v. Dixon,* 31 Vt. 450; *White-Wilson-Drew Co. v. Egelhoff,* 96 Ark. 105.

In the case of *Ex parte Goldberg & Lewis,* 191 Ala. 356, we find the court, speaking of the law merchant, using the following very appropriate language: "The law merchant is essentially the creation of the business world, whose practices have hardened into principles, and these principles have been shaped and polished for centuries by the lapidaries of the law, all to one supreme end, viz., the protection of a *bona fide* holder for value who has acquired a negotiable instrument in the due course of trade or business. Only such protection can give confidence, and only confidence can give free currency to any

medium of exchange. This is the capstone of the structure known as 'commercial law.' Its codification into a uniform negotiable instruments law has been accomplished, not for the purpose of altering any of its essential principles, and certainly not for the purpose of destroying or weakening its cardinal principle, but for the purpose of harmonizing certain minor differences existing in the various jurisdictions."

Some courts seem to hold that the whole of section 5348 must be read together in reaching a definition of the word "negotiated" as used in the negotiable instruments law. Appellant cites numerous cases, some holding to this view, others, when rightly understood, not sustaining such contention. We shall notice a few of them herein.

The main case is *Vander Ploeg v. Van Zuuk,* 135 Ia. 350, 13 L. R. A. n. s. 490. In this case the two defendants, Van Zuuk, were to have been joint makers with one Pothoven. The note was signed by the two defendants in blank. The blank was turned over to Pothoven, who filled it out payable to plaintiff, or order, for $2,000, and, being indebted to plaintiff in said amount, delivered it to him. The plaintiff had no knowledge of the facts. Pothoven never was the holder of a completed instrument, neither did he give any consideration for it. Indeed, he would have been a joint maker had he done as he agreed with the defendants. He never possessed an instrument he could negotiate. Pothoven defrauded the plaintiff and defendants. He was not the holder of a promissory note, for it was a blank as delivered to him. The statutory definition, "An instrument is negotiated when it is transferred from one person to another in such manner as to constitute the transferee the holder thereof," contemplates an instrument and a holder. Pothoven was neither, within the meaning of the negotiable instruments law. He was in possession of a blank only. The statutory definition of "holder" is: " 'Holder' means the payee or indorsee of a bill or note, who is in possession of it, or the bearer thereof." Pothoven was not the

bearer of a completed note. Under the law merchant the plaintiff would have been a holder in due course. The negotiable instruments law has changed the law merchant in this respect, as it deals with a completed instrument only. The Iowa court was right in holding plaintiff was not a holder in due course under our negotiable instruments law. However, the Iowa court say: "We do not mean to say that in no case can the person named as payee in a negotiable instrument be the holder thereof 'in due course.' If A., purchasing a draft to be transmitted to B., in payment of A.'s debt to B., causes the draft to be drawn payable to B., no doubt A. is the holder of such draft, and B. taking it for value becomes a holder in due course." As this hypothicated case is not different in principle from the case at bar, we feel the Iowa case is not an authority against our conclusion herein.

The case of *Britton Milling Co. v. Williams*, 44 S. Dak. 525, seems to sustain appellant's contention, and is the last expression of any court on the subject, so far as we have been able to ascertain. We are constrained to the belief that this case is based upon a misunderstanding of the Iowa case, and also the *Herdman* case, cited therein, and is contrary to the weight of authority.

The Oregon case cited, under the facts existing therein, is not an authority against our position herein. This seems clear from a later decision of that court, *Simpson v. First Nat. Bank*, 94 Or. 147, 159, where it is stated: "Nothing said in the opinion rendered in *Bank of Gresham v. Walch*, 76 Or. 272, should be construed to mean that this court is committed to the doctrine that under the negotiable instruments law the payee is never a holder in due course."

It will serve no useful purpose to discuss any more of the authorities cited. Some of them seem to sustain appellant's position, others, we believe, do not, when rightly understood. We are satisfied a payee in a negoti-

able instrument may, under our negotiable instruments law, as he could at common law, be a holder in due course, and that the great weight of authority so holds. We also believe, upon principle, this is the logical position.

The settled law is that, where the defense interposed is fraud in the inception of the note, and there is evidence to support such defense, the burden is upon the plaintiff to prove that he is a *bona fide* holder for value. There is no question but that appellee was entitled, in the case at bar, to have gone to the jury on this proposition. Therefore, the only question remaining is: Did appellant furnish evidence sufficient on the question of fraud and failure of consideration, and appellee's knowledge thereof, to have entitled him to have gone to the jury?

As to the question of fraud it is necessary to examine the proof. Randell was told by McClaran, Lanagan, and Lyons, that there was an abundance of ore, that there were many tons being mined daily, that a great deal of ore had been marketed and the money for it would be paid at once, and that dividends would be paid almost from the start at 10 per cent. a quarter and would soon pay the note. Randell was further told that many carloads of ore were being mined daily, and that 60 men were at work in the mines, that there was a good demand for the ore, and that ore sales were contracted for five years ahead, so that their profits were assured, even if the war closed; that there were millions of tons of ore untouched, that they knew, as drillings had been made, that they had the best of machinery, and they were selling $500,000 of stock to obtain money to operate the mine and to develop new ones.

These statements, in the main, were false. There never was a 40 per cent. dividend, and, in fact, no dividends of any importance, certainly insufficient to pay any part of the note. The mine closed down in the fall of 1919, and this is when Randell discovered the truth for the first time. Randell had no experience in the mining business,

and, of course, trusted to these men, McClaran, Lanagan, and Lyons. Randell testified that these men sort of hypnotized him. One cannot read this record without concluding that Randell's mind was controlled by these men, and that they dictated the contract on both sides and there never was a meeting of the minds, the first requisite of every valid contract.

Section 5373 of the negotiable instruments law provides: "The title of a person who negotiates an instrument is defective within the meaning of this chapter when he obtained the instrument, or any signature thereto, by fraud, duress or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud."

It would seem, therefore, from what has been said, that it was a question of fact for the jury to determine whether or not McClaran and Lanagan obtained the first note from Randell by fraud, within the meaning of section 5373, above quoted. The jury might well have found that the representations were made as statements of facts, that they were untrue, and known at the time to be untrue, or else made recklessly upon insufficint information; that they were made with intent to defraud and for the purpose of inducing Randell to act upon them; and that he did so act and was thereby damaged. If the jury so found, surely there was sufficient evidence to have sustained the verdict. And this was the test, although the court might have thought the finding should have been otherwise. To say the least, it seems to us there was sufficient evidence to have gone to the jury on the question of fraud.

Section 5374. "To constitute notice of an infirmity in the instrument, or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

McClaran stated in his testimony that he thought he told Locher what the note was given for; that is, what Randell received for the note. Lanagan, in his testimony, seemed to think Locher was told all about the deal, but insisted on giving his conclusions. Locher himself would not say unequivocally he was not told what the note was given for. Locher held a contract for the sale of Onahman Iron Company ore and must have known little ore was being mined and sold. Locher testified he knew at the time he delivered the blank note to McClaran and Lanagan that they already held Randell's note. He knew, therefore, he was to get a renewal note. He testified he did not know the note was at the First National Bank at the time he gave the blank to McClaran and Lanagan, so that the renewal note might run to the bank as payee. He requested McClaran and Lanagan to have Randell put up the shares of stock he held as collateral. He knew a note was at the First National Bank McClaran and Lanagan had to meet, presumably because Randell had failed to pay it. Under these circumstances the jury might well have concluded that Locher knew the original Randell note was given for these shares of stock in the Onahman Iron Company, and that the note was obtained by fraud and without consideration. Indeed, the jury might well have concluded that Locher made McClaran and Lanagan the agents of the bank to obtain this renewal note and the shares of stock as collateral for the bank. If the jury so found, then the bank could not have been a holder in due course. These were conclusions the jury might have drawn from the evidence, and, if they had, a verdict based thereon would have been sustained by the evidence. If different minds could have drawn different conclusions from the evidence, then the case should have gone to the jury. 8 C. J. 496, secs. 706 *et seq.; Lahrman v. Bauman,* 76 Neb. 846; *Central Nat. Bank v. Ericson,* 92 Neb. 396; *Arnd, Admr. v. Aylesworth,* 145 Ia. 185, 29 L. R. A. n. s. 638; *Mee v. Carlson,* 22 S. Dak. 365, 29 L. R. A. n. s. 351.

Under the evidence, facts, and circumstances in this case, it should have been submitted to the jury under proper instructions, and the judgment of the lower court is wrong, and the case is reversed and remanded.

REVERSED.