Argued at Pendleton May 9, affirmed November 7, 1923.

# AMERICAN NATIONAL BANK *v.* KERLEY ET AL.

### (220 Pac. 116.)

**Bills and Notes—Note Payable "to the Order of the Bearer" not One to "Bearer."**

1. A note payable "to the order of the bearer" is not one to "bearer," alternatively defined by Section 7801, Or. L., and under Section 7822 negotiable by delivery merely, within Sections 7793, 7976, declaring requisites of and defining a negotiable promissory note.

**Bills and Notes—Note Payable "to the Order of Bearer" One to "Order."**

2. A note payable "to the order of the bearer" is a negotiable promissory note to "order" within Section 7800, Or. L.; the word "bearer" alone meeting the requirement that the payee, if not named, must be "indicated with reasonable certainty."

**Bills and Notes—Payee may be a Holder in Due Course—"Negotiated."**

3. The payee of a note may be a "holder in due course," defined by Section 7844, Or. L., the word "negotiated" therein, in view of Section 7982, defining "holder," and Section 7851, declaring that "every holder is deemed *prima facie* to be a holder in due course," not excluding the payee, notwithstanding Section 7822, declaring when an instrument is negotiated.

**Bills and Notes—Principal Maker of Note Who Delivered It not Agent of Payee so as to Charge It With Notice of Infirmity Against Accommodation Signers.**

4. The principal maker of a note, who delivered it, was not the agent of the payee, so as to charge it with his knowledge of any agreement between him and the others who signed for his accommodation, whereby the note was to be used only if he got still more signers.

**Appeal and Error—Order Granting New Trial Affirmed if There Was Ground Therefor, Though not That Assigned by Trial Court.**

5. Order granting new trial will be affirmed if there was any prejudicial error committed of which movant could complain, though not that assigned by the trial court for the order.

**New Trial—May be Granted for Matters not Excepted to and Overlooked.**

6. Granting of new trial is authorized by misapplication of principles of law to which no exception was taken or inadvertence to which attention was not called.

**Bills and Notes—Payee Informed Before Acceptance of Delivery of Signing on Unperformed Condition not "Holder in Due Course."**

7. If tender of delivery of a note to the payee by the principal maker was not accepted at once, and before acceptance the payee

was informed of the unperformed condition on which the accommodation makers signed, the payee was not a holder in due course.

**Bills and Notes—Payee not Holder in Due Course Where It Had Notice of Infirmities After Accepting Note to be Applied on a Payment of Others, but Before Giving Credit.**

8. If a note was delivered by the principal maker, K., and accepted by the payee bank with the understanding that it should be applied as payment *pro tanto* of K.'s notes held by the bank, and thereafter, but before credit was given on the bank's books, it received notice of the unperformed condition on which the accommodation makers signed, Section 7846, Or. L., prevented it being a holder in due course.

**Bills and Notes—Statute as to Notice to Transferee Before Full Payment Inapplicable to Note Received as Collateral.**

9. A note received as collateral is not controlled by Section 7846, Or. L., declaring that, where transferee receives notice of infirmity in note before he has paid full amount therefor, he is a holder in due course only to extent of amount paid.

**Bills and Notes—Pre-existing Debt Consideration Relative to Holder in Due Course of Note Taken in Payment.**

10. Under Section 7817, Or. L., defining value, one receives a note for value, relative to being a holder in due course, where it is received in payment of the pre-existing debt of the principal maker, the others being accommodation makers.

**Bills and Notes—Pre-existing Debt Consideration to Holder in Due Course of Note Taken as Collateral.**

11. Under Section 7817, Or. L., defining value, in connection with Section 7819, as to holder having lien, one who takes a note as collateral to secure a pre-existing debt takes for value, relative to being a holder in due course.

**Bills and Notes—Pre-existing Debt, Though not of Full Value, Valuable Consideration for Note Taken as Collateral.**

12. Pre-existing debt, though not of full value, constitutes valuable consideration for note taken as collateral, relative to being a holder in due course.

**Pleading—Answer Held not to have Averred Note was Taken as Collateral so as to Aid Allegations of Reply.**

13. Answer in action on note *held* not as matter of law to have averred that the note was taken as collateral, with the effect of aiding the reply, which alleged merely that it was taken in payment of pre-existing debt.

**Bills and Notes—On Evidence of Note Originating in Fraud, Plaintiff must Show It was a Holder in Due Course.**

14. Though under Section 7851, Or. L., the fact that plaintiff, in action on a note, is a holder, standing alone, is sufficient *prima facie* proof of its being a holder in due course, on evidence being offered that the note originated in fraud, it has the burden of showing by a preponderance of the evidence that it took it under circumstances making it a holder in due course.

**Pleading—Defect in Answer not Alleging Bad Faith of Plaintiff in Taking Note Held Aided by Reply Making Good Faith an Issue.**

15. As to any defect in answer in action on note in not alleging bad faith on plaintiff's part in taking the note, the answer is aided by the reply making the question of good faith an issue by affirmatively alleging it.

**Bills and Notes—Under Pleadings, on Evidence of Note Originating in Fraud, Plaintiff Held Required to Show Both Absence of Knowledge and Taking in Good Faith.**

16. Under Section 7848, Or. L., as to what constitutes notice of infirmity in note or defect in title, good faith of plaintiff in taking the note being in issue under the pleadings, on evidence of the note having originated in fraud being offered, plaintiff has the burden not only of showing that it was without actual knowledge, but that it took in good faith.

**Evidence—Evidence of Conversation Between Accommodation Makers and Principal Maker Competent to Show Condition on Which They Signed.**

17. Defense of accommodation makers of notes being that they signed on condition, not fulfilled, that additional signers should be obtained by the principal maker, evidence of the conversation between them and the principal maker is competent to show what the condition was; the principal maker's opinion or conclusion as to what he told them not being enough, though the payee was not bound by the agreement between the two classes of makers unless it took with notice.

From Umatilla: GILBERT W. PHELPS, Judge.

In Banc.

The plaintiff, the American National Bank, a corporation, engaged in the banking business at Pendleton is attempting in this action to recover on an alleged promissory note signed by Joe Kerley, Abe Molstrom and W. H. Shannon. Kerley, although named in the pleadings as a party defendant, was not served with process, and for that reason the action has thus far been prosecuted against only Molstrom and Shannon who signed as accommodation makers. A trial in the Circuit Court resulted in a verdict and judgment in favor of the plaintiff and against Molstrom and Shannon for the full amount of the note. The court, upon the motion of Molstrom and Shannon, set aside the verdict and judgment and ordered

a new trial, and the plaintiff appealed from that order.

The complaint follows the form usually adopted in an action on a promissory note, and, among other things, it alleges that—

"on the 15th day of October, 1920, for valuable consideration the defendants made, executed and delivered to the plaintiff herein their joint and several promissory note in words and figures substantially as follows to wit:

"Pendleton, Oregon, October 15, 1920.

"Twelve months after date without grace for value received I promise to pay to the order of the bearer at the American National Bank at Pendleton, in Pendleton, Oregon, Five Thousand Dollars, with interest after date at the rate of 8 per cent per annum until paid. Principal and interest payable in United States gold coin; and in case suit or action is instituted to collect this note or any portion thereof, I promise to pay such additional amount as the court may adjudge reasonable as attorney's fees in said suit or action. Interest payable semi-annually.

"Joe Kerley,
"Abe Molstrom,
"W. H. Shannon."

The defendants Molstrom and Shannon joined in an answer in which they admit that they signed the instrument sued on but deny any liability, for the reasons set forth in a further and separate answer in which the respondents allege in substance, as follows:

That on October 15, 1920, and for a long time prior thereto Joe Kerley had been engaged in the insurance and brokerage business in Pendleton and had what appeared and was reputed to be a large and lucrative business; that he did his banking with the plaintiff and had theretofore borrowed considerable

money of the bank on notes given by him to the bank; that from some time prior to October 15, 1920, Kerley had, unknown to the respondents, been losing large sums of money and had been guilty of embezzling and appropriating large sums of money entrusted to his care and coming into his possession in the course of his business; that the bank secured knowledge of his financial condition and of his defalcations prior to October 15, 1920, and found that he was indebted to the bank in a large amount and that he had no property or means with which to pay in full his indebtedness to the bank and that he was insolvent and bankrupt; that the bank upon ascertaining these facts conferred with Kerley and informed him of its knowledge of his financial condition and of his criminal defalcations and instructed Kerley to prepare a promissory note with blanks for twenty or more signatures of financially responsible persons as co-makers with him to be held as additional security by the bank for the sums of money theretofore advanced and loaned to Kerley by the bank; that the bank instructed Kerley to keep from his friends and the public his financial condition and the fact that his criminal defalcations and further instructed him that if he did not prepare the promissory note and secure signatures thereto as required by the bank that the bank would cause his immediate arrest, prosecution, conviction and imprisonment for his defalcations; that the bank also instructed Kerley to secure signatures to the note by telling his friends that the bank desired a little additional security to continue financing him in his business and their signing would be conditioned upon twenty or more financially responsible parties signing as co-makers and until twenty or more so signed no liability whatever

would attach; that Kerley being intimidated by the threats of the bank and acting pursuant to its instructions, directions and under duress, prepared a memorandum resembling the instrument sued on with twenty or more blanks for signatures thereon and after signing the instrument as maker took it to Molstrom and Shannon and requested them to sign as co-makers with him stating to them that the bank desired a little additional security in order to continue financing him and that at its suggestion and behest he was securing the signatures of twenty or more of his friends as co-makers with him and that no obligation would attach to them or either of them until twenty or more signatures of financially responsible friends had been secured to the memorandum and that he would not deliver the instrument to the bank until twenty or more signatures of financially responsible parties had been secured and placed upon the document so that the liability of any one signer would not exceed the sum of $250; that acting upon the instructions, directions, and under the duress of the bank and its threats of prosecution Kerley did not advise either of the respondents of his financial condition or of the threatened criminal charges or of any of the matters touching his true financial condition and his liability to prosecution; that relying upon the representations of Kerley the respondents signed the instrument conditionally and for no purpose other than that relied upon, and without receiving any consideration whatever; that in violation of the agreement Kerley placed the instrument in possession of plaintiff without securing any additional signatures and that the bank refused to allow Kerley to take the instrument from its possession for the purpose of securing additional signatures; that the

bank knew at all times of the condition and agreement under which the respondents had signed the instrument and knew that the condition precedent to the delivery of the instrument to the bank had never been complied with; that the bank paid or parted with no new consideration of any kind or character whatever and that there is an entire want and failure of consideration for the instrument and that the instrument is void and illegal because of the alleged duress and threats and because of the concealment and misrepresentation of facts; and the respondents aver that the plaintiff is estopped by reason of its alleged acts and conduct from asserting or claiming any right or interest under the instrument as against the respondents.

In its reply the bank denies any knowledge or information sufficient to form a belief as to whether or not Kerley had been losing large sums of money, as to whether or not such losses, if any there were, were unknown to the respondents, as to whether or not Kerley had been guilty of embezzling or misappropriating any sums of money, and as to whether or not the respondents had knowledge or information of such matters. The plaintiff also denies that prior to October 15, 1920, it secured knowledge of any defalcations on the part of Kerley and denies that at that time the plaintiff found that Kerley had no property or means with which to pay his indebtedness to the bank or that he was insolvent or bankrupt. The plaintiff denies making the threats charged against it by the respondents and denies that it took the note with knowledge that the respondents had signed on the condition or with the understanding that the instrument should be signed by any other

109 Or.—11

persons, and denies that it took the paper in bad faith or with knowledge of any defect or infirmity.

For a further reply the bank alleges in substance as follows:

That on October 15, 1920, Kerley was indebted to the bank, and that he had been a customer of the bank and had been carrying a checking account therein; that during the fall of the year 1920 financial conditions were difficult and Kerley had not liquidated his obligations to the bank as they fell due; that it was not possible to carry the dishonored and overdue paper for a long period of time and for that reason the bank "demanded that the defendant Joe Kerley should make a new note to the plaintiff in the sum of $5,000 and that he should get some responsible signers thereon"; that pursuant to such demand Kerley made out a note and upon his own responsibility without the knowledge of the plaintiff he made the note so that there was room for fifteen or twenty or more signatures; that he took the instrument to Molstrom and Shannon who were his friends and procured them to sign it, and he then brought the note to the bank whereupon the plaintiff took and accepted the note "and on account thereof gave the defendant Kerley credit for the sum of $5,000 upon notes then held by the plaintiff against said defendant"; that the bank took and accepted the note on the same date upon which it was made or within one day thereafter "and accepted same for valuable consideration, to wit: the credit upon other obligations of the defendant Kerley," and accepted the same in due course of business without knowledge of the transactions between the defendant Joe Kerley and the respondents, Molstrom and Shannon, and without knowledge of the representations, if any,

that had been made by Kerley to Molstrom and Shannon and without knowledge that any signatures upon said note had been obtained by fraud or misrepresentations; and that the note was complete and regular upon its face and was accepted by the bank in good faith as an innocent holder in due course.

AFFIRMED.

For appellant there was a brief over the name of *Messrs. Raley, Raley & Steiwer* and *Mr. H. J. Warner,* with an oral argument by *Mr. Frederick Steiwer.*

of *Messrs. Peterson, Bishop & Clark,* with oral arguments by *Mr. Will M. Peterson* and *Mr. Edward Clark.*

HARRIS, J.—It will be difficult to discuss some of the questions presented for decision without first narrating many of the admitted facts and also much of the evidence relating to most of the controverted facts. Kerley had been engaged in the insurance and brokerage business in Pendleton, where he maintained an office. Kerley represented, among other insurance companies, the St. Paul Fire & Marine Insurance Company; and Fred Tebbin, who resided in Portland had the supervision of agents of that company, including Kerley. A month or six weeks prior to October 15, 1920, Tebbin, as trustee, took possession of Kerley's business. There is evidence in the record from which the jury could have inferred that Kerley was insolvent and unable to pay his debts in October, 1920, and that the bank through its vice-president knew that such was his financial condition; but there is no evidence tending to show that Kerley was guilty of any defalcation or embezzlement, or that the bank knew of his defalcations

if he was so guilty. On Friday, October 15, 1920, the date borne by the note in controversy, Tebbin sold Kerley's business, and on the next day, Saturday, Kerley's signs were removed and new ones substituted.

J. B. McCook who resided in Pendleton was the vice-president and the local executive manager of the plaintiff. Although Kerley did some banking business with another bank he apparently did most of his business with the American National Bank. At the time of the execution of the note in dispute Kerley owed the plaintiff about $16,000. We understand from the record that all this indebtedness was represented by notes given by Kerley and that the bank had at all times aimed to keep Kerley's indebtedness fully protected by collateral securities. The last loan or advance made to Kerley by the plaintiff was made in June or July, 1920. Kerley, before moving to Pendleton where he resided not more than three years, had lived in the town of Helix for several years.

Abe Molstrom is a farmer and he owned a ranch near Helix. He lived on the ranch in the summertime and resided in Pendleton during the winter; and he had known Kerley between six and seven years. Helix is about eighteen miles and Myrick is about eight miles from Pendleton. W. H. Shannon is a farmer and resides near Helix; and he had been acquainted with Kerley about six years. Neither Molstrom nor Shannon knew, when they signed the note that Kerley owed the plaintiff $16,000, or that Tebbin was in possession of Kerley's business, or that Kerley was insolvent if the fact is that he was insolvent. However, on the next day after signing the note Molstrom saw the changing of the signs at

Kerley's place of business and learned that the office had changed hands.

There are six important conversations to be borne in mind: (1) The conversation at McCook's residence on Thursday, October 14th, at about 6 P. M. when McCook in the presence of Tebbin demanded that Kerley procure additional security; (2) the conversation between Kerley and Molstrom on Friday, October 15th, when Molstrom signed the note; (3) the talk on October 15th between Kerley and Shannon when the latter signed the instrument; (4) the conversation between Kerley and McCook at McCook's residence Friday evening, October 15th, when Kerley placed the note in McCook's hands; (5) the conversation which Kerley claims he had with McCook one or two days after Friday; (6) and the conversation at the bank on Tuesday, October 19th, when Molstrom in the presence of Kerley told McCook that the note was to have been signed by others before delivery.

Tebbin happened to be in the bank at some time on October 14th, and at that time McCook requested Tebbin to ask Kerley to call at the bank. Tebbin promised to comply with the request and accordingly "about 3 o'clock in the afternoon of the same day" he asked Kerley to see McCook. Subsequently McCook informed Tebbin that Kerley had not called at the bank; and so Tebbin then hunted up Kerley and together they went to McCook's residence. Tebbin says, and there is no evidence to contradict him, that he did not know for what purpose McCook desired to see Kerley, but that having promised McCook that he would ask Kerley to call on McCook, he, in order to make his promise good and as a matter of courtesy to McCook, made Kerley "go to Mr. McCook's house with me that night." Tebbin, in relating what oc-

curred at McCook's house on the evening of October
14th, testified that McCook told Kerley that the
security which Kerley had at the bank "was not suffi-
cient to make the loan good and that they required
additional security," and that McCook then asked
Kerley

"what he could do upon which Mr. Kerley in sub-
stance replied and said he thought he could get a
note signed by twenty men, friends of his, and Mr.
McCook in substance replied, all right go and get it."

The note which Kerley thought he could get was to
be for $5,000. Tebbin says that McCook asked Kerley
to report the next day and that thereupon he, Tebbin,

"made a statement I thought it would be hardly pos-
sible to secure any large number of signatures in one
day and I suggested that Mr. Kerley be given more
than one day"; and McCook "consented to that as
far as I understood it"; McCook said: "Go ahead
and do the best you can, as far as time is concerned
that is the way I understand it."

Tebbin also testified that McCook did not by his
demeanor or otherwise express or imply any threat
against Kerley; and that "so far as the number of
signers was concerned" Kerley was the one who
"suggested he would be able to get twenty signers";
that McCook did not "put that (the number of
signers) up to him as a demand as far as the bank
was concerned"; and that nothing was said at Mc-
Cook's house about limiting the liability of each one
of the signers to $250.

Kerley says that "numbers of times" McCook
asked him to get more collateral security for his in-
debtedness to the bank and that McCook "was want-
ing to get payment as far as I could on them." Ker-
ley's testimony concerning the conversation at Mc-

Cook's house on the evening of October 14th is as follows:

"Mr. McCook told me after we went in there that I would have to get more collateral for the paper I had in the bank; that the collateral I had there was not sufficient for them to carry; and he asked me what I could do about getting more paper, and I told him I didn't have anything right at present which I could turn towards making it any better, but I might get out and get a note signed by some friends to cover part of it; and he asked me how much I could get and how soon, and I told him I could get a note signed up for about $5,000, providing I could get possible twenty signers, say with the liability on the note would not be $250; I didn't think I could get any one or two men to go on a note for the full amount under the conditions of things, I would not want to ask them to; so he told me to go ahead and see what I could do, and I told him I would go out the next day and see how many I could get; so he said, to go out and see how many I could get and report to him the next evening";

and according to Kerley "that is just about the extent of the conversation." Kerley, when asked whether he had any conversation with McCook prior to the execution of the note "about force being brought to bear on you about getting security," said: "I don't believe I did," and "the only thing he said was regarding more collateral, I would have to get more collateral, that was about all he ever said about it." McCook did not threaten Kerley with an indictment and prosecution for a crime if he did not procure a note. If any threats were made at all concerning the note in controversy they were made on the evening of October 14th at McCook's house; and, although McCook told Kerley "he had to get a bankable note" and "he had to have that note the

next day,'' the record is devoid of any evidence tending to show that McCook made any of the threats charged in the answer.

McCook's version of the conversation of October 14th is as follows:

''I told Joe Kerley that his paper at the bank needed fixing, some of his collateral was going bad on our hands, and I wanted him to fix up about $5,000 more security for us, new paper. * * I asked Joe Kerley what he could do, and Joe says: 'I used to be postmaster at Helix and lived there and have lots of friends up there and I think I can go up there among my friends and get a lot of signers on a note for you.' I think he went on and said, 'I think I can get as many as twenty signers.' 'Well,' I says, 'Whatever you do, Joe, get it done to-morrow,' and I think Joe brought up the point it would be hard to get a lot of signers in so short a time. 'Well,' I says, 'go ahead and get started, get whatever signers you can or whatever you do get it to-morrow and bring this note back to me to-morrow night'; and I think that is about the end of it. Joe says, 'All right,' and went away. * * The matter of twenty signers was never mentioned by me. * * Joe says, 'I used to live at Helix; I was postmaster there and I have a lot of friends there and I think I can take a note there and get it signed up by a lot of my friends'; and I said 'All right, get it done to-morrow.' * * He brought up the point it might be hard to get that done by to-morrow and get the note fixed by to-morrow; and I told him to go ahead and get whatever signers he could and bring the note back to me to-morrow. * * Joe made the remark he could get a lot of signers and he could get as many as twenty signers''; and ''I told him to go ahead and get the matter fixed up.''

After leaving McCook's house, Kerley wrote out with a typewriter the note in controversy and made

twenty-one spaces for that many signatures to the note. The next morning Kerley signed the instrument and then started for Helix. He encountered Molstrom on the highway between Helix and Myrick and then and there Molstrom attached his signature to the document. About three hours afterwards Kerley went to Shannon's ranch and secured the latter's signature.

The court refused to permit the respondents to offer evidence of the conversation occurring between Kerley and Molstrom when the latter signed the note. The court did, however, permit Kerley to testify that he told Molstrom what his "agreement with McCook was in regard to procuring the execution of the note"; but this permission amounted to nothing more than permission to the witness to state that in his opinion or according to his own conclusion what he stated to Molstrom was a statement of his agreement with McCook. The respondents were not permitted to show that Kerley told Molstrom that he had agreed with McCook to get a note for $5,000 signed by twenty responsible persons to be used by the bank as collateral security, and that the note would not be delivered to the bank until it was signed by twenty responsible persons in the sum of $5,000.

The condition of the record in respect of the conversation between Kerley and Shannon, when the latter signed the note, is substantially the same as the record made concerning the conversation between Kerley and Molstrom. Kerley was permitted to state that he informed Shannon of the agreement which he claims he had with McCook, but he was not allowed to relate what was actually said. When Shannon appeared as a witness the respondents, upon the refusal of the court to permit the witness to relate

the conversation, offered to prove that in the case of Shannon the conversation was in substance the same as the conversation offered to be shown in the case of Molstrom. However, the court did permit Shannon to testify that Kerley stated that there would be at least twenty signatures to the note ''before it was to be turned in to the bank.'' Aside from the last-mentioned testimony of Shannon and evidence concerning what was said in the bank on October 19th, and Kerley's testimony expressing his conclusion that he informed Molstrom and Shannon of the agreement made by him with McCook, and Kerley's testimony as to his conversation with McCook on Saturday or on Monday, there was no evidence as to what was actually said when the signatures of the respondents were procured.

Kerley says that he did not have time to find any more men to sign the note on October 15th, and so he returned to Pendleton and immediately went to McCook's house, arriving there at about 6 P. M. No persons were present at this conversation except Kerley and McCook. The following is Kerley's version of his conversation with McCook:

''I went up and told Mr. McCook that I had been out after signatures on the note, and he asked me what I had done and I told him I had two signatures on that note, and he asked me who they were, and I told him Mr. Molstrom and Mr. Shannon, and he asked me if I had the note with me, and I told him I did, and I showed it to him and he looked at it and he says, 'Yes, those are two good signers,' so he said, 'I will take this note to the bank in the morning and report on it, and you come around to-morrow.' ''

Kerley says that he did not on the 15th tell McCook any of the conversation had by him with Mol-

strom or with Shannon; that he did not express any objection to McCook's taking the note, although he does say that he did not know or have any reason to believe that McCook would not let him have the note for the purpose of getting more signatures.

The following is McCook's version of the conversation with Kerley on the evening of the 15th:

"Kerley came in and says, 'I have got that note,' and handed me that note, and I looked at it. I had not seen the note before. I looked at the name and I said, 'That is fine, that is all right.' * * Joe made the statement, 'I can get some more signers on that note'; I says, 'Well, if you want to, it is all right with us, but it is not necessary'; I says, 'If you want to get some more signers on that note bring them into the bank to-morrow or send them in and they can sign the note in the bank,' and Joe says, 'All right,' and went home."

McCook also testified:

"He [Kerley] said, 'I can get more signers on there if you want them.' * * I told him it was not necessary, but if he wished to do it, it was all right with us. * * I followed that up by saying if he did want to put more names on it to send them into the bank and have them sign it up."

Kerley testified that, after McCook said he would take the note to the bank and Kerley could come to the bank the next day, "if I remember right, I told him I wanted to get some more signatures on it."

McCook took the note to the bank and it "went through the regular routine and numbered up." The note continued to remain in the possession of the bank. There is evidence to the effect that the bank records contain entries made in McCook's own handwriting showing "that some of his [Kerley's] other notes were paid up by that [the one in dispute]

note"; but there is no evidence that any of such "other notes" were surrendered to Kerley. The evidence is silent as to the time when any entries were made showing payment of "other notes."

Kerley says that he went to the bank "either the next day," which would be Saturday, "or a couple of days after that," which would probably be Monday, and told McCook:

"I wanted to get more names on the note, that is more signatures on it, and asked him to let me take it out and get some more; and he told me if I could get any more to bring them into the bank and have them sign it there."

Kerley further says that at that time, whether Saturday or Monday, he informed McCook that he had told Molstrom and Shannon that he was "to get twenty signatures upon that note."

Molstrom went to Pendleton on the night of the 15th, and on the next day, Saturday, he learned that the note had been placed in the hands of the bank; and on Monday he received a notice from the plaintiff stating that the bank had the note. Molstrom says that he tried "to get hold of Kerley" on Saturday or Monday, and "finally got ahold of him on Tuesday * * and trotted him right across the street and we went to the bank." Kerley says that McCook showed to Molstrom the controverted note and the collateral paper held by the bank; that Molstrom told McCook that there were to have been twenty signatures to the note and that he did not think he should be liable since that number of names did not appear on the instrument. Kerley also says that he told Molstrom, who was "pretty mad," that if he did not want his name on the note, "I would try to get someone else to go on and try to get the other

signatures on it''; and that in the same conversation ''McCook told me I had better go out and get some more signers on that note. * * He told me to get some more signers and bring them into the bank and let them sign it there.'' Molstrom testified that he told McCook that the note ''is a fraud and obtained by misrepresentation'' and that ''there were to be twenty names'' on the note and that thereupon Mc-Cook said to Kerley, ''I think you had better get more names.'' When Molstrom told McCook that there were to be twenty names the latter did not assert that he did not know when he received the note that there were to be twenty names. When Shannon talked with McCook about two months after October 15th, the latter ''didn't say anything'' when Shannon told him that there were to be twenty signatures to the note.

1. It will be observed that the promise is ''to pay to the order of the bearer.'' The respondents contend that the instrument is not negotiable. The argument is that to be negotiable an instrument must be payable either to bearer with the right of transfer by delivery or else it must be payable to order with the limited right of transfer by the payee by indorsement and delivery; and that, if the instrument be treated as payable to order, the word ''bearer'' is not such a designation of the payee as complies with the negotiable instruments law. The position taken by the plaintiff is that the instrument is payable to bearer in the sense that it is transferable by delivery without indorsement.

Our attention has not been directed to any reported adjudication dealing with an instrument exactly like the one presented here. The language ''to the order of the bearer'' is unusual. However, the writing

on its face makes it plain that the signers intended to execute a negotiable promissory note. When bills of exchange first came into use choses in action were in general nonassignable, and so for the purpose of indicating the intention of the parties to make an instrument assignable and negotiable it became the custom to make the instrument payable to order or to bearer; and hence also when promissory notes subsequently came into use the same words were employed to indicate the same intention of the parties: Tiedeman, Commercial Paper, §§ 6 and 21. Ever since bills of exchange and promissory notes have been recognized as negotiable instruments and as such have to a large degree been given currency as money, the words "bearer" and "order" have been the conventional signs of negotiability, although equivalent words have been likewise recognized as signs of negotiability; and when by Section 7793, Or. L., it is declared that an instrument to be negotiable "must be payable to order or to bearer," and by Section 7802, Or. L., it is stated that if the word "order" or the word "bearer" is not used some term or terms must be used which clearly indicate an intention to conform to the requirement of the "negotiable instruments law," the statute merely announces what the law always has been since negotiable instruments came into use: 8 C. J. 151; 3 R. C. L. 876; *Essig* v. *Porter,* 63 Ind. App. 318 (112 N. E. 1005); *Wettlaufer* v. *Baxter,* 137 Ky. 362 (125 S. W. 741, 26 L. R. A. (N. S.) 804). See, also, Section 7976, Or. L. We have before us, therefore, a writing which contains, not one, but both the words which above all others have always been used to indicate an intention to invest a writing with negotiability. Although the intention of the makers to a written instrument may

be manifest, the writing cannot it is true be deemed a negotiable paper if it does not contain all the essentials prescribed by the negotiable instruments law: See *Evertson* v. *National Bank,* 66 N. Y. 14, 19 (23 Am. Rep. 9).

Does the writing in controversy comply with the requirements of the law? The respondents contend as already stated that the mandate of the statute is that a note must be made payable either to order or to bearer; that the note in dispute is not payable to bearer because the words "the order of" cannot be eliminated from the writing without making a contract different from the one signed by the maker; that if the words "the order of" are retained and given their natural meaning the result will be a writing payable to the order of a payee who is not indicated with the certainty required by the statute.

The negotiable instruments law defines instruments payable to order and instruments payable to bearer, and prescribes how they may be drawn and how they may be transferred to a holder.

Section 7800, Or. L., so far as it is material here, reads thus:

"The instrument is payable to order where it is drawn payable to the order of a specified person, or to him or his order. * * Where the instrument is payable to order, the payee must be named or otherwise indicated therein with reasonable certainty."

Section 7801, Or. L., is as follows:

"The instrument is payable to bearer (1) when it is expressed to be so payable; or, (2) when it is payable to a person named therein or bearer; or, (3) when it is payable to the order of a fictitious or nonexisting person, and such fact was known to the person making it so payable; or, (4) when the name of the payee does not purport to be the name of

any person; or, (5) when the only or last indorsement is an indorsement in blank.''

Section 7822, Or. L., reads thus:

''An instrument is negotiated when it is transferred from one person to another in such manner as to constitute the transferee the holder thereof. If payable to bearer, it is negotiated by delivery; if payable to order, it is negotiated by the indorsement of the holder, completed by delivery.''

A negotiable promissory note is defined by Section 7976, Or. L., thus:

''A negotiable promissory note, within the meaning of this act, is an unconditional promise in writing made by one person to another, signed by the maker, engaging to pay on demand or at a fixed or determinable future time, a sum certain in money to order or to bearer. * * ''

''Bearer,'' according to Section 7982, Or. L., means the person in possession of a bill or note which is payable to bearer.

It is substantially accurate to say that the negotiable instruments law is a codification of the law-merchant and that where any contrariety of judicial opinion existed concerning any given phase of the law, the statute, which was designed to bring about uniformity, usually adopted the majority view: *First Nat. Bank* v. *United States Nat. Bank,* 100 Or. 264, 281 (197 Pac. 547, 14 A. L. R. 479). The negotiable instruments law now declares, just as the law-merchant previously declared, that an instrument to be negotiable must be payable to order or to bearer. Two classes of commercial paper were recognized by the law-merchant and are now recognized by the negotiable instruments law. The characteristic of one is that, to preserve for the holder all the qualities and rights of negotiability, an instrument must be trans-

ferred by the indorsement of the payee, for, by naming or otherwise indicating the person to whose order the instrument is payable, the maker records his intention to limit the negotiability of the paper by imposing the condition of indorsement when the paper is transferred by the payee; while the characteristic of the other class is that transfer may be made by delivery and without indorsement. The word "order" carries with it the condition of indorsement by the payee; the word "bearer," when not limited by any other word, imposes no such condition and involves the right of transfer by delivery. In one instance the transfer by the payee must be by indorsement; in the other it may be but need not be by indorsement. Although Section 7793, Or. L., declares that an instrument to be negotiable must be payable "to order or to bearer," and Section 7976, Or. L., defines a promissory note as a writing containing a promise to pay "to order or to bearer," it does not follow that an instrument to be negotiable must contain only the word "order," or its equivalent, unaccompanied by the word "bearer"; or, that it must contain only the word "bearer," or its equivalent, unaccompanied by the word "order." The statute does not declare, nor did the law-merchant declare, that a paper is not negotiable merely because it contains both words of negotiability and is, for example, made payble "to the order of John Doe or to bearer." Manifestly such an instrument is negotiable and may be treated as one payable to bearer, for the promise is to pay in the alternative and one of the alternatives is to pay to bearer; *Phoenix Nat. Bank* v. *Saucier,* 102 Miss. 293 (59 South. 91); *Bitzer* v. *Wagar,* 83 Mich. 223 (47 N. W. 210); *Tescher* v. *Merea,* 118 Ind. 586 (21 N. E. 316); *Gibson* v. *Coates* (Man.), 1 West L. R.

556.   If the instrument in controversy had been drawn in the alternative; as, for example, "to the order of A or to bearer," it would be payable to bearer and could be transferred by delivery, for such a promise is to pay either to the order of A or to pay to the bearer whoever he may be.   The plaintiff argues that the holding announced in *Bitzer* v. *Wagar* settles the instant case and that by force of that decision the disputed writing should be treated as payable to bearer; but in our view that case is not applicable here, for there the promise was to pay to the "order of Marget A. Bitzer (or bearer)," while here the promise is to pay "to the order of the bearer."   One is in the alternative; the other is not.

If the words "the order of" could be ignored or eliminated the case would be free from difficulty, because obviously the instrument would in that event be payable to bearer without the condition of indorsement being imposed upon a transfer by the payee. Nor is the instant case analogous to one where an instrument is made payable "to the order of ——, or bearer," or "to —— or order, or bearer," or "to A or bearer"; *Grant* v. *Vaughan,* 3 Burr. 1516; *Melton* v. *Gibson,* 97 Ind. 158; *Sivley* v. *Williamson,* 112 Miss. 276 (72 South. 1008) ; *Mudd* v. *Bank,* 175 Mo. App. 398 (162 S. W. 314), because in the instant case the writing was prepared by Kerley with a typewriter and the words "to the order of the bearer" were typed with the usual spacing; and the clear intention of the makers manifested by the writing, to which we must look to ascertain that intention, was to make the instrument transferable by the indorsement of the payee.   The words "the order of" cannot be eliminated or ignored.

We cannot agree with the contention of the plaintiff that the instrument may be treated as one payable to bearer without the condition of indorsement, on the theory that it is payable to a fictitious payee; nor can we accept the view suggested by the plaintiff that the paper may be deemed payable to bearer on the theory that the name of the payee does not purport to be the name of any person within the meaning of Section 7801, subdiv. 4, Or. L. The rule, recognized by the law-merchant and by the statute, which declares that an instrument made payable to the order of a fictitious person is payable to bearer, and the likewise recognized rule which declares that a writing payable to the order of an impersonal or inanimate payee, as, for example, "cash," "bills payable," and the like, is payable to bearer, are based upon the idea that the maker, although knowing in one case that the payee is fictitious and therefore cannot indorse and in the other case knowing that the impersonal payee is neither a natural nor an artificial person and therefore is not a payee who can indorse, intends by the use of the word "order" to make the instrument negotiable, and since that intention cannot be effected by the indorsement of the fictitious or nonexisting payee or by the indorsement of the inanimate payee, the intention will in each of such two instances be given effect by treating the instrument as one payable to bearer. The reason upon which these two rules are based cannot be said to be present in the instant case; and, the reason failing, the rule fails. A fictitious or nonexisting person cannot be the "bearer" of a paper; nor can an inanimate payee be the "bearer"; but a natural or artificial person may be the "bearer" of paper: 3 R. C. L. 880; 20 Banking Law Journal, 362, 365; Selover on Neg. Inst. (2

ed.), 77, 80; *McIntosh* v. *Lytle,* 26 Minn. 336 (3 N. W. 983, 37 Am. Rep. 410); *Gordon* v. *Lansing State Savings Bank,* 133 Mich. 143 (94 N. W. 741); *Mechanics' Bank* v. *Straiton,* 3 Abb. Dec. 269, 5 Abb. Pr. (N. S.) 11.

We need not inquire whether a different case would be presented if the instrument had been drawn payable "to the bearer or order," although we may assume without deciding that if such were the language of the paper it would be negotiable on the theory that the word "bearer" is not limited and that therefore the instrument would be payable to bearer without the necessity of indorsement; or, it may be assumed, although we do not decide, that if the instrument were payable "to the bearer or order" the promise could be treated as an alternative one and that the writing could then be regarded as an instrument payable to bearer without the necessity of indorsement by the payee; but the assumptions mentioned can be of no avail, because the facts of the supposed case are not the facts appearing in the instant case.

It may be further contended that Section 7800, Or. L., which declares:

"The instrument is payable to order where it is drawn payable to the order of a specified person, or to him or his order,"

makes the writing in dispute the same for all purposes and in all respects as it would be if it read: "Pay to the bearer or his order"; and that therefore we should construe the instrument exactly as we should construe it if in fact it read: "Pay to the bearer or his order." The rule prescribed by the language last quoted from Section 7800, Or. L., must be read and construed in the light of the reason that brought the rule into existence. It has been fre-

quently said and in some countries it is held that
there is a difference in meaning between an instru-
ment payable ''to the order of A'' and one payable
''to A or his order,'' and that because of such dif-
ference an instrument payable ''to the order of A''
is not deemed payable to A, but is payable only to
his order, and that therefore the instrument is not
negotiable until the indorsement is made.   The statute
takes this subject out of the field of controversy, and
by force of Section 7800, Or. L., if a note is payable
''to the order of A'' he can sue on it without in-
dorsing it exactly as he could sue on a note payable
''to A or to his order''; for in contemplation of
law, so far as the question of the necessity of indorse-
ment is concerned, one phrase gives to the payee the
same right as the other phrase.   When the statute is
read in the light of its reason we cannot say that the
disputed instrument should be viewed as though it
read pay ''to the bearer or his order'' and after so
doing then say the words ''or his order'' can be
eliminated and ignored and finally hold that what is
left makes the instrument payable to bearer and there-
fore negotiable: 8 C. J. 173; Story on Promissory
Notes, § 36; *Robinson* v. *Wilkinson*, 38 Mich. 299.   It
is simply impossible to ignore or to eliminate the
words ''the order of'' from the writing.   The inten-
tion of the makers is made plain.   The manifest pur-
pose of the signers was to make the paper payable to
order, and the word ''bearer'' was used to indicate
the payee to whose order the instrument would be
payable.   On no theory can the paper be treated as
one payable to bearer and transferable by delivery
without ignoring the words ''the order of''; and that
cannot be done without defeating the recorded inten-
tion of the signers.   The fact that the word ''bearer''

is used does not conclusively make the instrument transferable by delivery. An instrument payable "to the bearer, A," is not negotiable, because the word "bearer" does no more than to describe A and the paper is merely the equivalent of a writing payable "to A." *Warren* v. *Scott,* 32 Iowa, 22; Ogden, Neg. Inst., 41; 8 C. J. 172. We therefore conclude that the paper in controversy is not a note payable to bearer within the meaning of Sections 7801 and 7822, Or. L., and that if it is a negotiable instrument at all it is one payable to order. Banks issue to their customers blank checks which are generally printed in one of two forms: one, with the printed words "pay to the order of," followed by a blank space in which is to be written the name of the payee; and, the other, with the printed words "pay to" followed by a blank space in which is to be written the name of the payee followed in turn by the printed words "or order." Frequently a depositor when using one of such blanks, writes merely the word "bearer" to indicate the payee and does not draw a line through the printed words, so that the check when it comes to the bank reads: "Pay to the order of bearer"; or, "pay to bearer or order." In the case of the check which reads "pay to bearer or order" no difficulty is encountered because the instrument is in the alternative and may be treated as a check payable to bearer and transferable by delivery. While it is not necessary to decide whether in the case of the check which reads "pay to the order of bearer," the instrument is to be treated as a check payable to order and transferable by indorsement or as one payable to bearer and transferable by delivery, it is not inappropriate to state that possibly it should be treated as one payable to bearer and transferable by delivery, because

of the circumstances attending the paper and appearing upon its face; for we know by observation and experience that when a blank check is filled out in the manner indicated the signer of the check usually intends to make the instrument payable to bearer and transferable by delivery and gives but little if any attention to the printed words "pay to the order of." In the instant case, however, Kerley deliberately wrote the words "pay to the order of the bearer" at the same time with the typewriter and it cannot on any reasonable ground be said that he intended that the words "the order of" should be ignored.

2. The next inquiry is: Does the paper meet the requirements prescribed for instruments payable to order? If the payee of a note payable to order is neither named nor otherwise indicated with reasonable certainty it is not negotiable, because it lacks an essential prescribed by Section 7800, Or. L. The primary purpose of the first sentence in Section 7800, Or. L., is to make it plain that the rights accruing to A when he holds a note payable "to the order of A," are, as previously explained, the same, so far as the necessity of indorsement and the right to sue are concerned, as if the note read "to A or his order." The last sentence of the section, however, is directly applicable; for this sentence commands that when an instrument is payable to order, "the payee must be named or otherwise indicated with reasonable certainty." This is not a new requirement, as the rule has always been that the person to whom the note is payable must be indicated and made known with reasonable certainty upon the face of the note; and this rule applies to all negotiable instruments and includes not only paper payable to bearer and trans-

ferable by delivery but also paper payable to order and transferable by indorsement: Story on Promissory Notes, § 40; Norton on Bills & Notes, 59; Selover on Neg. Inst. (2 ed.), 81; Tiedeman, Commercial Paper, § 17; 1 Daniel on Neg. Inst. (6 ed.), § 99; Eaton & Gilbert on Commercial Paper, 228.

The word "bearer" alone and of itself meets the requirements of certainty as to the payee. The word "bearer" means the person in possession of the bill or note; and when, therefore, a note payable to a payee designated as "bearer" is issued to a person, whether natural or artificial, it is in truth delivered to a person in being who is ascertained at the time of issue: Ogden, Neg. Inst., § 52; 8 C. J. 172. Under the law-merchant the word "bearer" measured up to the requirements of the general rule of certainty; the law recognized the word "bearer" as a term of certainty as to the payee. It was not necessary under the law-merchant to designate a person by his name, but it was sufficient if from the language used the person could be ascertained. In 8 C. J. 171, the rule is stated thus:

"The payee may be made to appear by a description instead of a name, where he can be ascertained or identified thereby at the time the note is executed."

See also: *Adams* v. *King,* 16 Ill. 169 (61 Am. Dec. 64); *Bacon* v. *Fitch,* 1 Root (Conn.), 181; *Knight* v. *Jones,* 21 Mich. 161; *Shaw* v. *Smith,* 150 Mass. 166 (22 N. E. 887, 6 L. R. A. 348); *United States* v. *White,* 2 Hill (N. Y.), 59 (37 Am. Dec. 374). "A note payable to A or bearer, or payable to bearer, is," says Story in his work on Promissory Notes in Section 36:

"A valid promissory note; for, in contemplation of law, it is solely payable to the person, who is, or

may become the bearer; and *Id certum est, quod certum reddi potest."*

In Tiedeman, Commercial Paper, Section 17, under the heading, "Designation of the Payee," it is said:

"Commercial paper may also be made payable to 'the heirs of A'; or to 'A or his heirs,' even though A should then be alive; or to the bearer, to the holder, and the like."

In Norton on Bills & Notes, page 59, under the heading "Designation of Payee," the following appears:

"It is not necessary, moreover, that the designation be by name, but a description of the payee is sufficient. 'Bearer' is a sufficient description."

To the same effect are: Note in 64 Am. Dec. 156; *Masterson* v. *Ginners' Mut. Underwriters Assn.* (Tex. Com. App.), 235 S. W. 1081, 1083; *Gordon* v. *Anderson,* 83 Iowa, 224 (49 N. W. 86, 32 Am. St. Rep. 302, 304, 12 L. R. A. 483). See also Chalmers' Bills of Exchange (8 ed.), 21, and 8 C. J. 172; *United States* v. *White,* 2 Hill (N. Y.), 59 (37 Am. Dec. 374); *Rich* v. *Starbuck,* 51 Ind. 87, 90.

When, therefore, Section 7801, Or. L., was written it was not necessary to include in it any express requirement concerning certainty as to the payee, because recognition of the negotiability of instruments payable to "bearer" also involved, just as the law-merchant involved, recognition by the law that the use of the word "bearer" or its equivalent designated the payee with the requisite certainty. When, however, Section 7800, Or. L., was written it was not only appropriate but it was advisable that the rule of certainty be stated in express terms, for the reason that this section does not contain any specific and fixed word which is of itself sufficiently de-

scriptive. In the last sentence of Section 7800, Or. L., which is declaratory of the law-merchant, the payee may be designated by the name of the person or if the name is not used the payee may be designated by words of description: *Bacon* v. *Fitch,* 1 Root (Conn.), 181; *Knight* v. *Jones,* 21 Mich. 161. The word "bearer" describes the payee and designates him with the necessary certainty. In *Grant* v. *Vaughan,* 3 Burr. 1516, 1527, it was said:

"Bearer is *descriptio personae* and a person may take by that description, as well as by any other."

It is true that we are accustomed to see the word "bearer" only in instruments which are designed to pass from the payee by delivery, and while it is true that the word "bearer" as used in the negotiable instruments law is used to mean instruments transferable by delivery, it is also true that the negotiable instruments law contains nothing which prohibits the maker of a note from using the word "bearer" to describe the payee in a note designed to pass from the payee by indorsement; and since any word which will describe the payee with certainty may be used and the word "bearer" is one of such words, the maker may employ the word "bearer" for the purpose of describing the payee to whose order the instrument is payable. We conclude that the paper signed by the respondents is a negotiable promissory note payable to order.

3. The negotiable instruments law, by Section 7844, Or. L., defines who is a holder in due course as follows:

"A holder in due course is a holder who has taken the instrument under the following conditions: (1) that it is complete and regular upon its face; (2) that he became the holder of it before it was overdue,

and without notice that it had been previously dishonored, if such was the fact; (3) that he took it in good faith and for value; (4) that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

The respondents argue that the statute excludes payees from those who may be holders in due course under the act, and that therefore the plaintiff, although a holder, is not capable of being a holder in due course. The plaintiff contends that the negotiable instruments law does not, when construed as a whole, exclude payees from those who may be holders in due course. The uniform statute which was designed to bring about uniformity has, instead of achieving that result, produced an irreconcilable contrariety of judicial opinion concerning the subject under discussion. In the final analysis this difference of judicial opinion arises from the different constructions placed upon the word "negotiated" in Section 7844, Or. L., when taken in connection with other sections of the statute. In Iowa it was held in *Vander Ploeg* v. *Van Zuuk*, 135 Iowa, 350 (112 N. W. 807, 124 Am. St. Rep. 275, 13 L. R. A. 490), that "holder in due course" should be construed as applicable only to one who takes the instrument by negotiation from another who is a holder. In that case the court manifested a reluctance to come to the conclusion announced by it and conceded that its conclusion was perhaps different from what would have been held if the negotiable instruments law had not been passed. We may for convenience designate the view expressed in *Vander Ploeg* v. *Van Zuuk* as the Iowa rule, for the reason that the Iowa decision is usually cited and relied upon by the other American courts which have adopted that view. The Iowa rule has been fol-

lowed in Kentucky, Missouri, Oklahoma and South Dakota: *S. N. Life Realty Corp.* v. *People's Bank of Bardstown,* 178 Ky. 85 (198 S. W. 543); *First Nat. Bank* v. *Utterback,* 177 Ky. 76 (197 S. W. 534, L. R. A. 1918B, 838); *St. Charles Savings Bank* v. *Edwards,* 243 Mo. 553 (147 S. W. 978); *Long* v. *Shafer,* 185 Mo. App. 641, 648 (171 S. W. 690); *Long* v. *Mason,* 273 Mo. 266 (200 S. W. 1062); *First Nat. Bank* v. *Allen,* 88 Okl. 162 (212 Pac. 597); *Britton Milling Co.* v. *Williams,* 44 S. D. 464 (164 N. W. 265, 21 A. L. R. 1352); *Tripp State Bank* v. *Jerke,* 45 S. D. 448 (188 N. W. 314). In Tennessee the court at least inclines to the Iowa doctrine: *Fox* v. *Cortner,* 145 Tenn. 482 (239 S. W. 1069, 22 A. L. R. 1341). Washington is, because of what is said in *Bowles Co.* v. *Clark,* 59 Wash. 336 (109 Pac. 812, 31 L. R. A. 613), usually classed among the states which have followed the Iowa rule; but the opinion in that case should perhaps be read in the light of a subsequent decision: *State Bank of Connell* v. *Pacific Grain Co.,* 125 Wash. 149 (215 Pac. 350).

The courts which have adopted the Iowa rule have reached that result by giving a limited construction to the word "negotiated" as it is used in Section 7844, Or. L. In Section 7982, Or. L., the negotiable instruments law expressly declares that "holder" means "the payee or indorsee of a bill or note who is in possession of it, or the bearer thereof"; and therefore a payee is a holder. Although Section 7982, Or. L., declares that a payee is a "holder" and Section 7844, Or. L., states that a holder is one who has taken the instrument in good faith and for value and at the time it was negotiated to him had no notice of any infirmity in the instrument or defect in the title in the person negotiating it, the Iowa rule limits

the word "holder" by excluding "payees"; and this conclusion is reached on the theory that the word "negotiated" as used in Section 7844, Or. L., does not apply to the delivery of a note by the maker to the payee.   This theory that the word "negotiated" as used in Section 7844, Or. L., is limited and excludes payees is based upon the language employed in Section 7822, Or. L., which reads as follows:

"An instrument is negotiated when it is transferred from one person to another in such manner as to constitute the transferee the holder thereof.  If payable to bearer, it is negotiated by delivery; if payable to order, it is negotiated by the indorsement of the holder, completed by delivery."

If the first sentence stood alone it is not likely that the language would afford much room for debate, for plainly delivery by the maker to the payee would be a transfer from one person to another and the transfer would be in such manner as to constitute the payee the holder; and therefore the instrument would be "negotiated" within the meaning of the sentence.   But it is held under the Iowa rule that the remainder of the section shows that the word "negotiated" was intended to apply only to transfers made by payees and by subsequent holders.   The Iowa rule depends primarily for its support upon a mere inference which is drawn from the last half of Section 7822, Or. L.   If the inference so drawn from Section 7822, Or. L., is warranted, then Section 7851, Or. L., is inconsistent with it, because the latter section affirms that "every holder is deemed *prima facie* to be a holder in due course."   The statute does not say: "Every holder, except a payee, is deemed *prima facie* to be a holder in due course."

The respondents contend that this court is committed to the Iowa rule by what is said in *Bank of*

*Gresham* v. *Walch,* 76 Or. 272 (147 Pac. 534). The
language used in that case must, as in all judicial
opinions, be read in the light of the issues presented
and of the facts involved. In *Simpson* v. *First Nat.
Bank,* 94 Or. 147, 159 (185 Pac. 913), we gave notice
that nothing said in *Bank of Gresham* v. *Walch*
should be construed to mean that this court is com-
mitted to the doctrine that under the negotiable in-
struments law the payee is never a holder in due
course, and we called attention to the fact that the
defense pleaded by Walch was based upon false
representations made by the agents of the bank, and
that the decision was controlled by those representa-
tions. And when in *Bank of Gresham* v. *Walch* it
was said that "plaintiff is not a holder thereof in
due course within the meaning of the statute," lan-
guage was used which would be clearly applicable to
the instant case if Kerley was an agent of the bank
or if there was an agreement between the bank and
Kerley as alleged in the answer, or if the bank did
not take in good faith or did not take for value or
had notice of any infirmity in the instrument, even
though it be held that a payee is a holder who is
capable of being a holder in due course. We have
examined the printed abstract, the bill of exceptions,
the transcript of evidence, the printed briefs and the
petition for a rehearing, and we find that at no time
in the Circuit Court nor in this court was it urged
or even suggested that a payee cannot be a holder in
due course under the negotiable instruments law.
None of the members of this court as now constituted
who were also members of this court as then con-
stituted intended that the opinion rendered in *Bank
of Gresham* v. *Walch* should decide or understood
that it did decide any questions except those based

upon the defenses pleaded by Walch. The under-
standing of the attorneys for the Bank of Gresham
concerning the questions for decision and concerning
the questions actually decided is evidenced by their
statement, in their petition for a rehearing, that—

"It will be conceded that if plaintiff had taken
this as it was presented to it, and paid value there-
for, without any knowledge as to any fraud entering
into its inception, it would have been a holder in due
course, and in a position to enforce it."

The question as to whether in this jurisdiction a
payee may under the negotiable instruments law be
a holder in due course is still *res integra.*

The view that the payee may within the meaning
of the negotiable instruments law be a holder in due
course was announced in *Liberty Trust Co.* v. *Tilton,*
217 Mass. 462 (105 N. E. 605, L. R. A. 1915B, 144);
and since that adjudication is usually cited and relied
upon by courts taking the same view, it will be con-
venient to refer to this view as the Massachusetts
rule. A majority of the courts which have thus far
considered the subject have followed the Massachu-
setts rule. The states of Vermont, Alabama, Penn-
sylvania, Idaho, New York and Illinois have an-
nounced adherence to the Massachusetts rule: *Howard
Nat. Bank* v. *Wilson* (Vt.), 120 Atl. 889; *Ex parte
Goldberg & Lewis,* 191 Ala. 356 (67 South. 839,
L. R. A. 1915F, 1157); *Johnston* v. *Knipe,* 260 Pa.
St. 504 (105 Atl. 705, L. R. A. 1918E, 1042); *Redfield*
v. *Wells,* 31 Ida. 415 (173 Pac. 640); *Brown* v. *Rowan,*
91 Misc. Rep. 220 (154 N. Y. Supp. 1098); *Bergstrom*
v. *Ritz-Carlton etc. Co.,* 171 App. Div. 776 (157 N. Y.
Supp. 959); Id., 220 N. Y. 569, 115 N. E. 1033; *Drumm
Construction Co.* v. *Forbes,* 305 Ill. 303 (137 N. E.
225). In *Bank of Commerce & Savings* v. *Randell,*

107 Neb. 332 (186 N. W. 70, 21 A. L. R. 1360), it was held that the negotiable instruments law "recognizes that a payee may be a holder in due course." See also: *White-Wilson-Drew Co.* v. *Egelhoff,* 96 Ark. 105 (131 S. W. 208). With but few exceptions authors of works on the negotiable instruments law and writers of articles found in law journals approve the Massachusetts rule: Dolle on Business Paper, 108; Williston on Commercial Law and the Law of Negotiable Instruments, § 319; Bunker on Negotiable Instruments, 103; Brannan, The Negotiable Instruments Law (3 ed.), pp. 49, 59, 162; 18 Illinois Law Review, 47, 48; 28 Yale Law Journal 197, 710; 64 University of Pennsylvania Law Review, 318; 70 University of Pennsylvania Law Review, 52; 10 California Law Review, 413; 21 Michigan Law Review, 591; 20 Michigan Law Review, 908; 24 Yale Law Journal, 429. An illuminating article by Professor Hening appears in 59 University of Pennsylvania Law Review, 471, 478. The opinion of the draughtsman of the Bills of Exchange Act, 1882 and 1906, may be found in Chalmers' Bills of Exchange (8 ed.), 105. In this connection, see also MacLaren on Bills, Notes and Cheques (5 ed.), 187. However, the Iowa rule is approved in 3 R. C. L. 238 and 15 A. L. R. 442.

Prior to the enactment of the negotiable instruments law it was held almost without dissent that a payee could occupy the status of a holder in due course: *Liberty Trust Co.* v. *Tilton,* 217 Mass. 462 (105 N. E. 605, L. R. A. 1915B, 144); *Bank of Commerce & Savings* v. *Randell,* 107 Neb. 332 (186 N. W. 70, 21 A. L. R. 1360); *Howard Nat. Bank* v. *Wilson* (Vt.), 120 Atl. 889; *Boston Steel & I. Co.* v. *Steuer,* 183 Mass. 140 (66 N. E. 646, 97 Am. St. Rep. 426); *Ex parte Goldberg &*

*Lewis,* 191 Ala. 356 (67 South. 839, L. R. A. 1915F, 1157); Crawford's Ann. Negotiable Instruments Law, 96; 8 C. J. 468. It is true that when the negotiable instruments law speaks its meaning should, if possible, be ascertained from the language used, and it must be conceded that when the meaning of the act is ascertained the statute controls even though it lays down a new rule; but it is also true that the statute is, with but comparatively few exceptions, a codification of the rules of the law-merchant, and in the absence of plain and clear language the courts ought to be slow to hold that the statute prescribes a new rule, especially when such holding must depend for its support upon a mere inference and is a veritable about face. An analysis of the reasoning upon which the Massachusetts rule is based could be nothing more than a repetition of what has been many times said by jurists and writers who have followed that rule, and we therefore content ourselves with stating that we agree with the reasoning employed in *Liberty Trust Co.* v. *Tilton* and approve the Massachusetts rule.

It must at all times be borne in mind that the instrument in dispute was signed by the three defendants; that Kerley, one of them, is the principal maker while the other two, Molstrom and Shannon, signed as makers for the accommodation of Kerley; and that if delivery was made at all it was made to the bank by Kerley who, as between the bank and the respondents, was the intermediary. Delivery, if made at all, was not made directly by the respondents to the plaintiff. Since, as between the bank as the payee, on the one side, and Molstrom and Shannon as accommodation makers, on the other side, Kerley was an intermediary, the plaintiff can recover from the

respondents if it was a holder in due course: *Brown* v. *Rowan,* 91 Misc. Rep. 220 (154 N. Y. Supp. 1098).

4. The respondents argue that Kerley was the agent of the bank, and that therefore knowledge of Kerley, the agent, is imputed to the bank, the principal. But Kerley was not the agent of the bank; and so say the authorities: 8 C. J. 207; *Helper State Bank* v. *Jackson,* 48 Utah, 430 (160 Pac. 287).

5, 6. For the purposes of this discussion we shall assume, without attempting to decide, that Molstrom and Shannon signed the instrument on condition that Kerley obtain the signatures of eighteen other persons so as to make a total of twenty accommodation makers, before delivery to the bank, and that if in truth the note was delivered to the bank by Kerley such delivery was in violation of Kerley's agreement with Molstrom and Shannon. If there was no delivery, then of course the plaintiff cannot prevail; nor can the bank recover if it cannot be said to be a holder in due course, even though delivery of the instrument was made. The appeal properly presents for decision questions concerning delivery of the note and also questions as to whether the plaintiff is a holder in due course. Although the trial court assigned as a reason for the order allowing a new trial, the giving of a prejudicial instruction concerning delivery, the order must be affirmed if during the trial any prejudicial error was committed of which the respondents can complain: *Duniway* v. *Hadley,* 91 Or. 343, 346 (178 Pac. 942). Indeed, the authority of the trial court

"extends to cases, where, by reason of some misapplication of the principles of law, to which no exception has been taken, or in consequence of some inadvertence to which attention has been called, the court is satisfied that a party has not had his case

properly presented." *Spokane County* v. *Pacific Bridge Co.*, 106 Or. 550, 553 (213 Pac. 151).

The jury were instructed that—

"Knowledge acquired after the delivery will not be considered by you. The only knowledge which would have the effect of defeating the bank's right to recover on a note, would be such knowledge, if any, as the bank, or its agents had at the time the note was delivered, if you find that it was delivered by the defendant Kerley to the plaintiff bank."

A new trial was granted for the reason that—

"There was no distinction made as between the time of delivery and the time of giving credit after the delivery."

The trial court was of the opinion that if delivery was made to the bank through McCook and after such delivery but before credit was given upon the books of the bank, the plaintiff through any of its representatives received notice of the condition upon which Molstrom and Shannon signed, then the plaintiff is precluded from occupying the status of a holder in due course, because of the provisions of Section 7846, Or. L., which declares:

"Where the transferee receives notice of any infirmity in the instrument or defect in the title of the person negotiating the same before he has paid the full amount agreed to be paid therefor, he will be deemed a holder in due course only to the extent of the amount theretofore paid by him."

It will be recalled that the plaintiff, in its reply alleges that it "took and accepted said note on the same day upon which it was made or within one day thereafter"; and it will also be recalled that the note was signed October 15th; that physical possession of the note was transferred to McCook on the eve-

ning of October 15th; that according to the testimony of Kerley, McCook at that time said: "I will take this note to the bank in the morning and report on it, and you come around to-morrow"; that although Kerley says that he did not on the evening of the 15th tell McCook of the condition upon which Molstrom and Shannon signed the note, he did say that he went to the bank, "either the next day," which would be Saturday, "or a couple of days after that," which would probably be Monday, and told McCook:

"I wanted to get more names on the note, that is, more signatures on it, and asked him to let me take it out and get some more; and he told me if I could get any more to bring them into the bank and have them sign it there";

and that Kerley further says that in that conversation, which was on Saturday or Monday, he informed McCook that he had told Molstrom and Shannon that he was "to get twenty signatures upon that note."

The instructions were framed on the assumption that if there was a delivery at all it occurred on the evening of the 15th. But it will be noticed that even though it be said that Kerley intended to deliver the note at that time, there is ground for debate as to whether or not acceptance of the tendered delivery was postponed and did not occur until McCook took the note to the bank and reported on it.

7. If Kerley's tender of delivery was not accepted by the bank until Saturday and after Kerley on that day gave notice of the conditions upon which Molstrom and Shannon signed, then of course the bank was not a holder in due course. If, however, delivery was tendered and accepted on the evening of the 15th the case presents itself in two aspects, depend-

ing upon whether the note was delivered and accepted in payment or as collateral.

8. If the note was delivered and accepted on the evening of October 15th with the understanding that it should be applied as payment *pro tanto* of Kerley's notes held by the bank, and, after such delivery and agreement but before the credits were made upon the books of the bank, the plaintiff received notice of the infirmity of the note, can it be said that the bank was a holder in due course? If the note had been delivered on the evening of the 15th and McCook acting for the bank had agreed to pay money for the note the next morning after reporting to the bank, and, before paying the money, McCook received notice of the infirmity of the note, then Section 7846, Or. L., would prevent the bank from enforcing the rights of a holder in due course. No difference can be perceived, so far as the legal principle is concerned, between the supposed case and a case where, instead of paying money for the note, the holder is to pay by crediting the amount of the note upon the debt; the contract is executory in the case where payment is made by giving credit to the same extent as in the case where payment is made by handing over money; and we therefore hold that plaintiff cannot recover if the note was delivered and accepted as *pro tanto* payment of Kerley's indebtedness to the bank and the plaintiff before giving credit received notice of the condition upon which Molstrom and Shannon signed as accommodation makers. The trial court ruled correctly when it allowed the motion for a new trial.

9. The necessity for complete and accurate instructions about delivery and notice is strongly emphasized when the record shows, as it does, that the ver-

dict was undoubtedly based upon the theory that the note was delivered as payment and not as collateral, for the reason that the court told the jury in effect that if the note was given as collateral the plaintiff could not recover.

If, however, the note was delivered and accepted as collateral, then Section 7846, Or. L., is not applicable. When paper is delivered and accepted as collateral the relation of the holder to the paper is ordinarily fixed at the time of the acceptance of the delivery; and, indeed, if the relation did not become so fixed, negotiable paper would to a large extent lose its chief and most valuable quality, and in the hands of a pledgee would for all practical purposes be of little if any more value than non-negotiable paper, even though taken by the pledgee under all the circumstances which distinguish a holder in due course. A promissory note received as collateral is not controlled by Section 7846, Or. L.: *Griswold* v. *Morrison,* 53 Cal. App. 93 (200 Pac. 62); *Felt* v. *Bush,* 41 Utah, 462 (126 Pac. 688); Brannan, The Negotiable Instruments Law (3 ed.), 180; Crawford's Ann. Negotiable Instruments Law (Revised Uniform Ed.), 101.

10. The controversy as to whether or not the bank was a holder in due course presents several questions for decision. The plaintiff is not a holder in due course unless it took the note in good faith and for value and without notice of any infirmity in the instrument or defect in the title of the person negotiating it. The respondents contend that the plaintiff is not a holder for value; and this contention presents itself in two aspects: (1) if the note was received in payment *pro tanto* of Kerley's indebtedness; and (2) if it was taken as collateral security for his indebtedness. While the evidence is not posi-

tive and direct, the inference to be drawn from the record is that Kerley's indebtedness to the bank had matured and was due: See 8 C. J. 492.   Section 7817, Or. L., defines value as "any consideration sufficient to support a simple contract," and declares that "an antecedent or pre-existing debt constitutes value, and is deemed such, whether the instrument is payable on demand or at a future time."

If the note was delivered and accepted as payment it becomes unnecessary to inquire into the views expressed by different courts before the adoption of the uniform negotiable instruments law, because it is obvious that under Section 7817, Or. L., the pre-existing debt furnished a consideration for the note and made the bank a holder for value: 8 C. J. 494.   It is appropriate to state, in this connection, that the delivery and acceptance of the note does not extinguish the original indebtedness, unless the parties agree to give and accept the note as absolute payment; and that while it must appear that the parties agree, the agreement may be expressed in direct terms, or it is sufficient if from all the facts and circumstances it appears that the parties intended and understood that the note should be received in absolute payment of the antecedent debt: *Seaman* v. *Muir*, 72 Or. 583, 589 (144 Pac. 121); *Riner* v. *Southwestern Surety Ins. Co.*, 85 Or. 293, 299 (165 Pac. 684, 166 Pac. 952); *City of Pendleton* v. *Jeffery & Bufton*, 95 Or. 447, 457 (188 Pac. 176).

11. If a note is taken as collateral for a debt created at the time the security is given and on the faith of it, the courts are practically agreed that the transfer is for value: 8 C. J. 487; or where some new and valuable consideration passes at the time the collateral is given, as, for examples, the release of

other collateral, extension of the time for payment of the original debt, forbearance to sue on the original debt, and the like, the holder then occupies the status of a holder for value: 8 C. J. 492. However, in the instant case we are obliged to assume, without attempting to decide, that no independent consideration was given for the note and that the pre-existing debt furnished the only consideration, if any there was, for the note taken as collateral, if it was so taken, to secure that debt. The federal courts, as well as the English and Canadian courts, have always ruled that a holder who takes a negotiable note as collateral security for a pre-existing debt is a holder for value. The view of the federal courts was adopted by most of the American state courts, and for that reason this view is commonly known as the federal rule. In New York, prior to the adoption of the negotiable instruments law, it was held that the taking of a promissory note as collateral security for a pre-existing debt without some independent consideration was not a taking for value. This view was accepted by some of the American courts and is usually referred to as the New York rule. It is now generally held that under the terms of the negotiable instruments law, one who takes a negotiable note as collateral to secure a pre-existing debt takes for value, even though no independent consideration is given; and this holding is not only based upon Section 25 of the act (Section 7817, Or. L.), but it is also strengthened and fortified by Section 27 of the act (Section 7819, Or. L.), which affirms that—

"Where the holder has a lien on the instrument, arising either from contract or by implication of law, he is deemed a holder for value to the extent of his lien."

*Voss* v. *Chamberlain,* 139 Iowa, 569 (117 N. W. 269, 130 Am. St. Rep. 331, 19 L. R. A. (N. S.) 106); *Felt* v. *Bush,* 41 Utah, 462 (126 Pac. 688); *Griswold* v. *Morrison,* 53 Cal. App. 93 (200 Pac. 62); *State Bank of Freeport* v. *Cape G. & C. R. Co.,* 172 Mo. App. 662, 672 (155 S. W. 1111); *People's State Bank* v. *Penello,* 59 Cal. App. 174 (210 Pac. 432); *City Nat. Bank* v. *Kelly,* 51 Okl. 445 (151 Pac. 1172); *Brown* v. *Rowan,* 91 Misc. Rep. 220 (154 N. Y. Supp. 1098); 64 University of Pennsylvania Law Review, 318. See also *Birket* v. *Elward,* 68 Kan. 295 (74 Pac. 1100, 104 Am. St. Rep. 405, 1 Ann. Cas. 272 and note 64 L. R. A. 568); *Exchange National Bank* v. *Coe,* 94 Ark. 387 (172 S. W. 452, 21 Ann. Cas. 934, and note 31 L. R. A. (N. S.) 287 and note); 8 C. J. 488–495; 3 R. C. L. 1057–1061.

In this connection it is pertinent to direct attention to *Flint* v. *Phipps,* 16 Or. 437, 449 (19 Pac. 543, 550), where prior to the adoption of the negotiable instruments law this court said:

"His [Owens] debt would be a sufficient consideration to sustain the note, so that if Phipps either executed the note to secure the debt of Owens, or the liability of himself and Owens on the bond, the note would have a sufficient consideration to support it."

It is true that most of the adjudications dealing with notes given as collateral involve instruments which were payable to the debtor and by him indorsed to his creditor. In such situations the note is a subsisting obligation at the time of its transfer to the indorsee; but in those same situations, value for the indorsement is the *sine qua non;* and without it the indorsee is not a holder in due course. If under the statute a pre-existing debt is value for an indorsement and enables the indorsee to be a holder in

due course, then by the same token, the statute, a pre-existing debt is value for a note and enables the payee to whom an instrument has come through an intermediary to occupy the status of a holder in due course. In *Lowell* v. *Bickford,* 201 Mass. 543 (88 N. E. 1), it is said:

"Taking the demand note as collateral for the pre-existing debt made the bank a holder for value of the note as against Carrie S. Bickford, who was an accommodation maker. (Citing authorities.) The fact that the demand note was payable to the bank did not prevent its becoming a holder for value. (Citing authorities.) An accommodation party to a note cannot set up lack of a consideration against a holder for value."

In *Neal* v. *Wilson,* 213 Mass. 336 (100 N. E. 544), it was held:

"Where a defendant for the accommodation of a debtor and without consideration gives his note or check to a creditor of the debtor in payment of or as security for the debt due from the debtor to the creditor, he is liable to the creditor on the note or check."

In *Seager* v. *Drayton,* 217 Mass. 571 (105 N. E. 461), the following language appears:

"It is the contention of the plaintiff that there was a valid consideration for the note (1) because of the forbearance of the plaintiffs to sue Wright; (2) because the defendant's note was given in substitution for the note given by Wright and thereby constituted a novation; and (3) because the note of the defendant was given to the plaintiffs as creditors of the debtor Wright in payment of, or as security for, the debt due from Wright to the plaintiffs. If the plaintiffs' proof was sufficient to establish either of these contentions, they would be entitled to recover."

See also Brannan, The Negotiable Instruments Law (3 ed.), pp. 99–93, 107, 108.

The rule followed in cases where a purely nominal consideration is given, or where the consideration paid for a note is grossly inadequate, does not control cases where a pre-existing debt constitutes the consideration; and consequently precedents like *Hogg* v. *Thurman,* 90 Ark. 93 (117 S. W. 1070, 17 Ann. Cas. 383), and *In re Hill,* 187 Fed. 214, have no application to the instant case.

12. The respondents assert that the debt owing from Kerley to the bank was worthless, and that therefore, on the authority of *Citizens' Trust Co.* v. *McDougald,* 132 Tenn. 323 (178 S. W. 432, L. R. A. 1917C, 840), the antecedent debt did not constitute a valuable consideration. The answer to this contention of the respondents is found in the fact that, although the debt may not have been, and probably was not, worth its face value, the evidence indicates that it was worth something. Moreover, for a criticism of the precedent last cited see Brannan, The Negotiable Instruments Law (3 ed.), 107.

13. The printed briefs discuss the questions of variance, matters of pleading, and the burden of proof. It will be recalled that the answer avers that Kerley requested the respondents to sign as co-makers as the bank "desired a little additional security in order to continue financing him"; and that the bank alleges in its reply that it accepted the note "for valuable consideration, to wit: the credit upon other obligations of the defendant Kerley."

It will also be recalled that the substance of all the evidence concerning the conversation at McCook's residence on the evening of October 14th was that the bank wanted additional security. The respondents in-

sist that there is no evidence to sustain the averment in the reply that the note was taken as payment, and that evidence, if there be any, of acceptance of the note as collateral is a variance from the averment in the reply. The plaintiff replies to the contention of the respondents by arguing that it makes no difference whether the plaintiff accepted the note as payment or as collateral, for in either event the plaintiff says that the acceptance was for value, and that since the respondents have alleged that the note was executed to be used as collateral the respondents have thus alleged value and thus rendered it unnecessary for the plaintiff to prove value. It is true that if the note was given and accepted as payment or as collateral, in either event it was for value: *Campbell* v. *Fourth Nat. Bank,* 137 Ky. 555 (126 S. W. 114). It is also true that it is not likely that the respondents were taken by surprise. But it cannot be said as a matter of law that the respondents have alleged that the note was signed to be used as collateral. The language of the answer is broad. It is true that the answer speaks of "a little additional security," but the purpose of the security is explained thus: "in order to continue financing him." The answer is fairly susceptible to the construction that the note was to be used for obtaining subsequent advances or for new loans. The fact remains, however, that the plaintiff averred payment and did not allege that the note was taken as collateral security. And this brings us to the question of the burden of proof.

14. The instant case is not one where the sole issue is whether there is a want or failure of consideration; and so we are not required to construe Sections 7816 and 7820, Or. L., although it is pertinent to direct attention to *Bank of Gresham* v.

*Walch,* 76 Or. 272, 278, 279 (147 Pac. 534), where we held that ultimately it is incumbent upon the plaintiff to prove by a fair preponderance of the evidence upon the whole case that there was a consideration: See also 1 Daniels on Negot. Inst. (6 ed.), 221; *Ginn* v. *Dolan,* 81 Ohio St. 121 (90 N. E. 141, 135 Am. St. Rep. 761, 18 Ann. Cas. 204); *Bringman* v. *Von Glahn,* 71 App. Div. 537 (75 N. Y. Supp. 845). See also Brannan, The Neg. Inst. Law (3 ed.), 95 et seq.

Under the terms of Section 7851, Or. L.

"Every holder is deemed *prima facie* to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he, or some person under whom he claims, acquired the title as a holder in due course; but the last-mentioned rule does not apply in favor of a party who became bound on the instrument prior to the acquisition of such defective title."

The fact that the plaintiff is a holder, when that fact stands alone, suffices to prove that the plaintiff is a holder in due course until contradicted and overcome by other evidence. When evidence is offered showing that the note originated in fraud it then devolves upon the plaintiff to go forward by offering evidence to meet the contradictory evidence, and the burden is upon the plaintiff to show by a preponderance of the evidence the ultimate fact that it took the note under circumstances making it a holder in due course: *Hansen* v. *Oregon-Wash. R. & N. Co.,* 97 Or. 190 (188 Pac. 963, 191 Pac. 655); *Bank of Jordan Valley* v. *Duncan,* 105 Or. 105, 112 (209 Pac. 149); *Everding & Farrell* v. *Toft,* 82 Or. 1, 18 (150 Pac. 757, 160 Pac. 1160); *Gourley* v. *Pioneer Loan Co.,* 51 Okl. 434 (151 Pac. 1072); *Deshaze* v. *L. & E. Lamar,* 17 Ala. App. 392 (85 South. 586); *First Nat. Bank* v.

*Hall,* 31 Idaho, 167 (169 Pac. 936) ; *McClellan* v. *Morris,* 71 Colo. 304 (206 Pac. 575) ; *Campbell* v. *Fourth Nat. Bank,* 137 Ky. 555 (126 S. W. 114).

15, 16. The plaintiff argues that there was no evi-dence that it had actual knowledge of any infirmity or defect and that since the respondents did not al-lege bad faith on the part of the plaintiff, the ques-tion of bad faith, on the authority of *Bank of Jordan Valley* v. *Duncan,* 105 Or. 105, 122 (209 Pac. 149), is not in the case. If we assume that the answer is defective as claimed, the plaintiff is nevertheless not in a position to urge it, because the plaintiff in its reply made the question of good faith an issue for decision by affirmatively alleging good faith; and this allegation in the reply operated to aid the answer: *Catlin* v. *Jones,* 48 Or. 158, 163 (85 Pac. 515) ; *Hodson-Feenaughty Co.* v. *Coast C. & F. Co.,* 91 Or. 630, 649 (178 Pac. 382, 179 Pac. 560) ; 31 Cyc. 714. The plaintiff must, under the pleadings, after evidence of fraud is offered show by a preponderance of the evidence not only that it was without actual knowl-edge but that it took in good faith, if there was a de-livery of the note: Section 7848, Or. L.

17. The respondents were entitled to show the con-versation between Molstrom and Kerley and the talk between Shannon and Kerley. The defense of the respondents is that they signed on condition that eighteen additional signatures be secured. Whether they did so sign depends upon what was said; and it cannot be known what was said unless the conver-sations are related to the jury who must in the end determine whether the respondents did sign as claimed by them. It is not enough for Kerley to give his opinion or his conclusion as to what he told Molstrom and Shannon. Evidence of those two con-

versations is competent for the purposes of determin-ing the condition or conditions upon which Molstrom and Shannon signed. The bank is of course not bound by the agreement between Kerley and the re-spondents unless the bank took the note with notice. Although this evidence is admissible, the purpose of it and the extent of its competency should be ex-plained and limited by appropriate instructions.

The order granting a new trial is affirmed.

AFFIRMED.

BURNETT, J., took no part in the decision.